No. 01-118

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 66

_____

| | | |
|---|---|---|
| BITTERROOT RIVER PROTECTION ASSOCIATION, INC., | ) | |
| | ) | |
| Petitioner, | ) | O R D E R |
| | ) | |
| v. | ) | A N D |
| | ) | |
| BITTERROOT CONSERVATION DISTRICT, | ) | O P I N I O N |
| | ) | |
| Respondent. | ) | |

_____

1¶     The Bitterroot River Protection Association, Inc. (the "BRPA") seeks a writ of prohibition to stop the Bitterroot Conservation District (the "BCD") from proceeding with a determination of whether the Mitchell Slough, a body of water in the Bitterroot Valley, is a "stream," as defined in the Natural Streambed and Land Preservation Act of 1975.

2¶     The following issue is dispositive of this petition:

3¶     May the Bitterroot Conservation District make the initial determination of whether the Mitchell Slough is a "natural perennial-flowing stream?"

BACKGROUND

4¶     The BCD is the authorized conservation district for Ravalli County, Montana.  In its role as a conservation district, the BCD is responsible for issuing permits to any person who plans to alter or modify a stream in Ravalli County.  Over the years, the BCD

1

has issued a number of permits for a body of water called the Mitchell Slough. The Mitchell Slough lies roughly to the east of Victor, Montana.

5¶ In July 1995, Brian Monta requested a portage permit from the BCD for the Mitchell Slough. Because of this portage request, a question arose concerning the designation of the Mitchell Slough as a perennial-flowing stream. If the Mitchell Slough was not a perennial-flowing stream, then it would not be subject to the provisions of the Natural Streambed and Land Preservation Act of (1975) (the "Streambed Preservation Act") and would thus be outside the jurisdiction of the BCD. After unsuccessfully attempting to have the State Department of Natural Resources and Conservation, the State Fish Wildlife and Parks and the State Department of Environmental Quality determine whether the Mitchell Slough was a "natural perennial-flowing stream," the BCD decided to use a public hearing process to make this determination.

6¶ The BCD published legal notices in the *Ravalli Republic* on December 19, 2000, and January 8, 2001, stating that they would hold a hearing on whether the Mitchell Slough was a perennial-flowing stream on January 16, 2001. According to the notice, the BCD would begin its deliberations on the status of the Mitchell Slough at its regularly scheduled meeting on January 30, 2001, and, if necessary, would continue its deliberations until it made a determination. After the January 16 hearing, the BCD requested that the public file comments and additional written information through January 23, 2001.

¶7 On January 24, 2001, the BRPA sought an alternate writ of prohibition to stop the BCD from determining the status of the Mitchell Slough from the Twenty First Judicial District Court, Ravalli County. The BCD began deliberating the status of the Mitchell Slough at its January 30, 2001, meeting. The next day, the District Court held a hearing. Following the hearing, Judge Jeffrey Langton denied the BRPA's writ of prohibition. The BRPA then filed for a writ of prohibition with this Court.

## DISCUSSION

¶8 May the Bitterroot Conservation District make the initial determination of whether the Mitchell Slough is a "natural perennial-flowing stream?"

¶9 A writ of prohibition serves to stop an entity exercising judicial functions from acting when the proceedings are beyond its jurisdiction. *See* § 27-27-101, MCA. We will not grant a writ of prohibition, however, unless the party seeking the writ demonstrates that the proceedings are clearly unlawful. *See Kimble Properties, Inc. v. Dept. of State Lands* (1988)*, 231 Mont. 54, 56, 750 P.2d 1095, 1096; *see also State ex rel. Lee v. Montana Livestock Sanitary Bd.* (1959), 135 Mont. 202, 209, 339 P.2d 487, 491 (stating that a writ of prohibition will not restrain an entity exercising a judicial function, so long as the entity has jurisdiction of the subject matter in controversy). A writ of prohibition should not replace an appeal or perform the function of a writ of review. *See Lee*, 135 Mont. at 209, 339 P.2d at 491. Therefore, in order to grant the BRPA's request for a writ of prohibition, we must conclude that the BCD's decision to

3

determine whether the Mitchell Slough is a stream was clearly outside its authority. We cannot reach such a conclusion.

10¶ The Streambed Preservation Act serves "to protect the use of water for any useful or beneficial purpose as guaranteed by The Constitution of the State of Montana." Section 75-7-102, MCA. The Streambed Preservation Act is also commonly referred to as the "310 law." Enforcement of the Streambed Preservation Act is largely the responsibility of conservation districts. In their enforcement capacity, the districts' duties include overseeing proposed alterations or modifications of streams in Montana. *See generally* §§ 75-7-103(5), -112, 76-15-103(3), MCA. In Ravalli County, where the Mitchell Slough is located, the BCD is the responsible conservation district. The BCD has five elected supervisors and one appointed by the mayor of Hamilton, Montana. Each supervisor is responsible for a different region within Ravalli County. *See generally* § 76-15-301, MCA.

11¶ When a person seeks to alter or modify a body of water in Ravalli County, the BCD must approve the project if the body of water in question is a "stream." The Streambed Preservation Act defines a stream as "any natural perennial-flowing stream or river, its bed, and its immediate banks except a stream or river that has been designated by district rule as not having significant aquatic and riparian attributes in need of protection or preservation." Section 75-7-103(6), MCA. The BRPA correctly notes that the Streambed Preservation Act does not specifically authorize conservation districts with the power to classify bodies of water as streams. In fact, the Act does not authorize any

4

specific entity with this power. The BRPA argues that, because the BCD lacks the specific authority to hold a hearing to classify the Mitchell Slough, the BCD is improperly acting outside the scope of its power. While the BRPA cites two Montana cases in support of this proposition, neither of these cases has precedential value to the matter now before us.

12¶    In the first case, *Bell v. Department of Licensing* (1979), 182 Mont. 21, 594 P.2d 331*,* this Court ruled on the scope of the Department of Professional and Occupational Licensing's power to regulate barber colleges. While Montana law enumerated certain personal requirements for the operators of barber colleges, the Department of Licensing added additional requirements to those already codified by the legislature. We held that, by adding additional requirements to those already codified in the statute, the Department went beyond the scope of its power. *See Bell*, 182 Mont. at 23, 594 P.2d at 333.

13¶    In the second case, *Taylor v. Taylor* (1995), 272 Mont. 30, 36, 899 P.2d 523, 526-27, we concluded that an administrative law judge had violated the model rules of evidence by not holding an in-person hearing in a child support case. Specifically, the judge violated the statutory requirement that "agencies shall be bound by common law and statutory rules of evidence." *See Taylor*, 272 Mont. at 34, 899 P.2d at 525 (citing § 2-4-612(2), MCA). An administrative agency, we held, could not adopt rules that conflicted with statutory requirements or exceeded the agency's powers. *See Taylor*, 272 Mont. at 36, 899 P.2d at 526. Nevertheless, we allowed the agency to continue with its

5

hearing by ultimately remanding the case back to it. *See Taylor*, 272 Mont. at 36, 899 P.2d at 527.

14¶ Unlike the agencies in either *Bell* or *Taylor*, the BCD is not seeking to add requirements to those already in the code or contradict its provisions. Instead, the BCD is simply attempting to apply the legislature's articulated requirement of "natural perennial-flowing stream." This is a necessary task that the code fails to assign to any specific entity. Neither *Bell* nor *Taylor* addresses this jurisdictional question.

15¶ Numerous other cases support the rule that a court should allow an agency to determine initially whether it has jurisdiction. *See Wilson v. Department of Pub. Serv. Regulation* (1993), 260 Mont. 167, 171, 858 P.2d 368, 370; *General Atomics v. United States Nuclear Regulatory Comm'n* (9th Cir. 1996), 75 F.3d 536, 541 (holding that a court could not review an agency's order asserting jurisdiction because the agency had initiated a hearing to obtain the facts necessary to make the final jurisdictional determination); *Lone Star Cement Corp. v. FTC* (9th Cir. 1964), 339 F.2d 505, 509-10 (concluding that a court may not review an agency's jurisdiction until the party exhausts his or her administrative remedies); *Marshall v. Burlington Northern, Inc.* (9th Cir. 1979), 595 F.2d 511, 513; *Marshall v. Able Contractors, Inc.* (9th Cir. 1978), 573 F.2d 1055, 1057; *California ex rel. Christensen v. FTC* (9th Cir. 1977), 549 F.2d 1321, 1323 *cert. denied,* (1977) 434 U.S. 876, 98 S.Ct. 227, 54 L.Ed.2d 156. When an agency blatantly acts outside the scope of its authority, however, courts have allowed exceptions to this rule of exhaustion. *See, e.g., Leedom v. Kyne* (1958), 358 U.S. 184, 189, 79 S.Ct. 180, 184, 3

L.Ed.2d 210 (holding that the National Labor Relations Board acted beyond its delegated powers when it acted in direct contradiction to a specific statutory prohibition). Courts also have excused the exhaustion requirement when they resolve the merits before addressing exhaustion. *See, e.g., McKart v. United States* (1969), 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (holding that a petitioner was exempt from military service before deciding that his failure to appeal should foreclose all judicial review); *Greene v. United States* (1964), 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (holding that an agency must pay a claim before concluding exhaustion of remedies is unnecessary). One commentator has explained this latter line of cases as ones where the courts decide to rule on relatively easy issues on the merits, while avoiding more complex issues of exhaustion. *See* 2 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 15.4 (3rd ed. 1994). Some courts have established the more formal analysis that a court may interfere with an agency's initial determination of its jurisdiction only where (1) the agency's jurisdiction is plainly lacking; (2) clear evidence exists that requiring a party to exhaust its remedies will result in irreparable injury; and (3) the agency's special expertise will be of no help on the question of its jurisdiction. *See Burlington Northern*, 595 F.2d at 513. In practice, however, courts have rarely found instances where a party overcomes these three hurdles. Furthermore, examining the facts of this case, we cannot conclude that we should interfere with the BCD's ability initially to determine the scope of its jurisdiction.[1]

---

[1] Although most of our analysis concerning the BCD's ability to determine its own jurisdiction is predicated on comparisons to governmental agencies, we note that the

¶16 First, the BCD's jurisdiction is not plainly lacking. Where the merits of a jurisdictional question are a close one, an agency should make the initial determination. *See Christensen,* 549 F.2d at 1324. As we noted, the Streambed Preservation Act offers no clear guidance about who may answer the jurisdictional question of which streams are "natural perennial-flowing." The most logical interpretation, however, is to allow the BCD to make the initial determination of a stream's status. Otherwise, until some entity classifies the Mitchell Slough as a stream, the BCD presumably could not regulate projects or grant permits as the Streambed Preservation Act authorizes it to do. After all, the Act only authorizes conservation districts to regulate projects on streams that are "natural perennial-flowing." *See* § 75-7-103(6), MCA. Without the authority to classify bodies of water in Ravalli County, the BCD would have to wait to grant permits until another entity decides what bodies of water are streams.

---

BCD is actually a governmental subdivision. Specifically, the code defines a conservation district as a "governmental subdivision of this state and a public body corporate and politic." Section 76-15-103(3), MCA. Comparing other portions of the Montana Code, the legislature clearly intended for governmental subdivisions and agencies to be two distinct types of governmental entities. *See, e.g.,* § 17-5-202(2), MCA (defining a public body as an "agency *of* a political or governmental subdivision" (emphasis added)); § 25-9-702(9), MCA (defining "person" as a "governmental subdivision *or* agency" (emphasis added)); Rule 62(e), M.R.Civ.P. (stating that when an appeal is taken by an "agency *or* governmental subdivision" of the State of Montana, the appellant is not required to provide security (emphasis added)); § 30-1-201(28), MCA (stating that an "organization" includes a "governmental subdivision *or* agency" (emphasis added)). An agency's authority is more limited than that of an entity that consists of elected officials because an agency is not directly accountable to the public. *See State ex rel. Dreher v. Fuller* (1993), 257 Mont. 445, 451, 849 P.2d 1045, 1048. Here, the voters of Ravalli County elect four of the five supervisors of the BCD. Therefore, if agencies may normally make the initial determination concerning their own jurisdiction, we see no reason to be more restrictive when dealing with the BCD and we proceed with our analysis accordingly.

8

¶17 An even more problematic consequence of concluding that the BCD may not determine its own jurisdiction is that district rules may delist streams that do not have "significant aquatic and riparian attributes in need of protection or preservation" under the Act. Section 75-7-103(6), MCA. Therefore, if a district court or other entity were to decide that the Mitchell Slough is a stream, the BCD could essentially veto this determination by designating the Mitchell Slough as not having "significant aquatic or riparian attributes." Having the same entity decide what is a stream and conversely decide what is not a stream is more logical than having a district court or other entity decide the former and the BCD decide the latter.

¶18 Second, we cannot conclude that allowing the BCD to determine whether they have jurisdiction to classify the Mitchell Slough as a "natural perennial-flowing stream" will cause irreparable injury. If the BRPA disagrees with the BCD's actions, it has several remedies. For instance, the BRPA may always seek judicial review of the BCD's rulings. *See* § 2-3-113, MCA. Furthermore, it may be conceivable that future actions of the BCD may be properly scrutinized via a writ of review. *See* § 27-25-102(2), MCA.

¶19 Finally, the BCD's expertise is not clearly without value here. The BRPA notes that the BCD has the authority to make the potentially subtle determination of what bodies of water lie outside its jurisdiction, mainly whether a natural perennial-flowing stream has "no significant aquatic and riparian attributes in need of protection or preservation." It is difficult to understand, therefore, how the BCD does not have the

9

expertise to make the opposite determination of when a body of water does lie within its jurisdiction.

20¶　The BRPA also argues that the BCD's decision to classify the Mitchell Slough jeopardizes a citizen's constitutional right to access Montana's surface waters. Under the Montana Constitution, the State owns the waters for the benefit of its people, and the public has the right to use these waters. *See Montana Coalition for Stream Access, Inc. v. Curran* (1984), 210 Mont. 38, 53, 682 P.2d 163, 171; *Montana Coalition for Stream Access, Inc. v. Hildreth* (1984), 211 Mont. 29, 35-36, 684 P.2d 1088, 1091. Following our decisions in *Curran* and *Hildreth,* the 1985 Montana Legislature enacted Title 23, chapter 2, part 3 of the Montana Code Annotated to protect the recreational use of surface waters (the "Stream Access Act"). Under the definition of surface waters, the Stream Access Act specifically excludes ditches from its protection. *See* § 23-2-301(6), MCA. According to the BRPA, if the BCD determines that the Mitchell Slough is not a stream, the only logical conclusion would be that the Mitchell Slough must therefore be a ditch. If classified as a ditch, the Mitchell Slough would then lose its constitutional protection. The BRPA argues that a question with constitutional implications such as this is better left in the hands of an entity other than a local conservation district.

21¶　Examining the Montana Code, however, we cannot conclude that the statute establishes the binary scheme the BRPA envisages where a body of water can be either only a stream or a ditch. When construing a statute, we must do so according to the plain meaning of its language. *See Norfolk Holdings, Inc. v. Department of Revenue* (1991),

10

249 Mont. 40, 43, 813 P.2d 460, 461. Here, the Streambed Preservation Act and the Steam Access Act each use two entirely different definitions for designating what bodies of water are covered under their respective provisions. The Streambed Preservation Act never refers to a ditch, and, conversely, the Stream Access Act never refers to a natural perennial-flowing stream. *Compare* § 75-7-103, MCA (defining terms under the Streambed Preservation Act) *with* § 23-2-301, MCA (defining terms under the Stream Access Act). Neither the Streambed Preservation Act nor the Stream Access Act states that if a body of water is not a stream under the Streambed Preservation Act, it is necessarily a ditch under the Stream Access Act. Therefore, while the BCD's decision on the Mitchell Slough's status as a stream is potentially significant, the decision, regardless of its outcome, does not necessarily determine whether the Mitchell Slough is a ditch under the Stream Access Act. These are instead two separate factual inquiries.

22¶ A writ of prohibition "is justified only by extreme necessity, when the grievance cannot be redressed by ordinary proceedings at law, or in equity, or by appeal." *State ex rel. Morse v. Justice Court* (1981), 192 Mont. 95, 97, 626 P.2d 836, 837 (quoting *State ex rel. Browne v. Booher* (1911), 43 Mont. 569, 571, 118 P. 271, 272). The existence of another remedy, even if inconvenient and indirect, prevents a party from seeking a writ of prohibition. *See Morse*, 192 Mont. at 97-98, 626 P.2d at 837. In the interest of both judicial economy and agency efficiency, an exhaustion of administrative remedies allows a governmental entity to make a factual record and to correct its own errors within its specific expertise before a court interferes. *See Burlington Northern*, 595 F.2d at 513.

11

Once the BCD has determined the status of the Mitchell Slough, nothing in this opinion prevents the BRPA from seeking judicial review of the BCD's declaratory rulings. *See* § 2-3-113, MCA. For these reasons, we will not grant a writ of prohibition to stop the BCD from making the initial determination of whether it may decide if the Mitchell Slough is a "natural perennial-flowing stream." Therefore,

23¶ IT IS HEREBY ORDERED that the BRPA's petition for a writ of prohibition is DENIED.

24¶ The Clerk of Court is directed to notify the parties of this Order by mailing a copy to the counsels of record.

DATED this 4th day of April, 2002.

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ TERRY N. TRIEWEILER
/S/ JIM RICE

/S/ WM. NELS SWANDAL
Wm. Nels Swandal, District Judge
siting for Justice W. William Leaphart