No. 02-733

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 136

JACK PAULSON and DONNA PAULSON,

Petitioners and Appellants,

v.

FLATHEAD CONSERVATION DISTRICT and
MONTANA DEPARTMENT OF FISH,
WILDLIFE AND PARKS,

Defendants and Respondents.

APPEAL FROM:     District Court of the Eleventh Judicial District,
                 In and For the County of Flathead, Cause No. DV 2001-420B,
                 Honorable Katherine R. Curtis, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            Wilmer E. Windham, Attorney at Law, Polson, Montana

        For Respondents:

            Ed Corrigan, County Attorney; Dennis J. Hester, Deputy County
            Attorney, Kalispell, Montana

            Rebecca J. Dockter, Special Assistant Attorney General, Helena, Montana

                                    Submitted on Briefs:  May 13, 2003

                                            Decided:   May 25, 2004

Filed:

        _____
                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Appellants Jack Paulson and Donna Paulson (Paulsons) appeal the July 18, 2002, order of the Eleventh Judicial District Court, Flathead County, granting a motion for judgment on the pleadings by Respondents Flathead Conservation District (FCD) and Montana Department of Fish, Wildlife and Parks (FWP).  We affirm.

¶2    We restate the issues as follows:

¶3    1.  Did the District Court err in concluding that the arbitration panel validly determined factual and legal issues in accordance with the arbitration provisions of The Natural Streambed and Land Preservation Act of 1975?

¶4    2.  Did the District Court err in concluding Delano A. Hanzel was a neutral arbiter?

¶5    3.  Was the arbitration process constitutional?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶6    This case involves a dispute between owners of property situated on Bigfork Bay in Flathead County, Montana, and two administrative agencies, the Flathead Regional Development Office (FRDO) and the FCD.  The FRDO is the county agency charged with administration of the Flathead County Lakeshore Protection Program (Lakeshore Program), governed by § 75-7-201, *et seq*., MCA, which grants authority to local governments for protection of the natural lakes of Montana.  The FRDO exercises jurisdiction over projects in Flathead Lake.  The FCD is the agency charged with administration of The Natural Streambed and Land Preservation Act of 1975 (Streambed Act), governed by § 75-7-101, *et seq*., MCA, which grants authority to conservation districts for protection of Montana's

2

natural rivers and streams. The Streambed Act is also called the "310 Law," so named after the permit required for construction projects in Montana's streams (310 Permit). The FCD exercises jurisdiction over projects in the Swan River. Section 75-7-112, MCA, of the Streambed Act, calls for a "team" consisting of one representative of the applicant, the FCD, and FWP to consider proposed projects in Montana's rivers and streams.

¶7 On January 3, 2000, the Paulsons submitted a project proposal to the FRDO for construction of a retaining wall and dock extension into what they considered Flathead Lake. Upon receipt of their permit for the project from the FRDO, the Paulsons began work on their waterfront improvements. In May 2000, however, the Paulsons were notified by the FCD that they may be in violation of the Streambed Act because, according to the FCD, their project was also located in the Swan River. Thus, on May 11, 2000, the Paulsons submitted to the FCD a project application, entitled Joint Application for Proposed Work in Montana's Streams, Wetlands, Floodplains, and Other Water Bodies (Joint Application), requesting after-the-fact approval for the installation of the retaining wall and dock extension into the Swan River.

¶8 On May 22, 2000, the FCD Board of Supervisors (Supervisors) denied the Paulsons' request for a 310 Permit. The letter from the FCD notified the Paulsons that anyone proposing work in a perennial stream must first obtain an approved permit from the local conservation district, and, as the landowners, they were responsible for correcting their illegal activity. The letter set forth several conditions for restoration of the stream and its immediate banks, including removing the concrete retaining wall and the dock extension,

3

taking measures for reclamation and erosion control, and undergoing a site inspection by the FCD when they had restored the river bank to its original condition.

¶9    The Joint Application form provided a means of responding in the event an applicant disagreed with the supervisors' decision. On July 7, 2000, the Paulsons returned the form with a check in the box stating, "I disagree with the supervisors' decision and hereby formally request arbitration."

¶10    Over the course of the next twelve months, the Paulsons took a number of steps to determine which agency, the FRDO or the FCD, had jurisdiction over their waterfront improvement project. First, the Paulsons requested and received written verification from the FRDO that the retaining wall complied with the requirements of their valid Lakeshore Program permit. Then, the Paulsons requested and received a letter from the Flathead County Commissioners to the FCD stating that, in their opinion, since their project was not situated in a streambed, the FCD should cooperate in issuing a 310 Permit. The FCD responded to the Commissioners' letter that the process was presently under arbitration as established by the Streambed Act, and an arbitration panel would make a final decision in the matter. At that point, the Flathead County Attorney's Office initiated legal representation of the FCD. The Paulsons proceeded *pro se.*

¶11    Pursuant to the statutory arbitration process as set forth in § 75-7-114, MCA, of the Streambed Act, the Paulsons, the FCD, and FWP each chose three proposed arbitrators and submitted the names to senior Flathead County Judge Ted O. Lympus. Judge Lympus chose one representative from each of the parties' list of three submissions to serve on a three-

4

member arbitration panel. One member of the panel, to whom the Paulsons object on appeal, was Delano A. Hanzel, a FWP retiree.

¶12 A fourteen-hour arbitration hearing was held on May 3, 2001. However, the hearing transcript is not part of the record on appeal. The parties allege that the major issue before the arbitration panel was whether the Supervisors correctly determined that the situs of the Paulsons' construction project was on a "natural, perennial-flowing stream or river" and therefore subject to the FCD's jurisdiction. On May 11, 2001, the arbitration panel rendered its decision that the FCD, did, in fact, have jurisdiction pursuant to the Streambed Act over this matter.

¶13 The Paulsons subsequently secured legal counsel who, on August 3, 2001, filed a motion to vacate the arbitration award in District Court. The Paulsons contended at the time of arbitration, as they do on appeal, that the instant dispute involved a jurisdictional issue between administrative agencies which was a question of law to be determined by the District Court, not a question of fact for the arbitration panel. The Paulsons' motion requested: (1) that the District Court hold a hearing to determine which, if either, of the involved local governmental agencies had jurisdiction under these circumstances; (2) permission to serve the Flathead County Commission; (3) a determination of the appropriateness of legal representation of the FCD by the Flathead County Attorney's Office; (4) an order vacating the arbitration award in favor of the FCD; and (5) if the court determined jurisdiction was proper under the conservation district, appointment of a new

5

panel which did not include a retiree from an involved party (FWP). Paulsons' motion did not raise constitutional issues.

¶14 On August 31, 2001, the Flathead County Attorney, on behalf of the FCD, joined by FWP, filed a response to the Paulsons' motion to vacate. These pleadings asserted the Paulsons' motion failed to state a claim upon which relief could be granted and requested an order confirming the arbitration award and dismissing the motion.

¶15 On October 5, 2001, the Flathead County Attorney, on behalf of the FCD, filed a motion for judgment on the pleadings pursuant to Rule 12(c), M.R.Civ.P., in which the FWP concurred. The Paulsons filed a brief in opposition, followed by replies by both the Flathead County Attorney and FWP. The issues raised by the motion were: (1) whether the arbitration panel had the power to determine both the factual and legal issues before it; (2) whether a conflict of interest arose from the legal representation of the FCD by the Flathead County Attorney's Office in light of the FRDO's involvement in the jurisdictional dispute, since both entities are Flathead County administrative agencies; and (3) whether arbiter Delano A. Hanzel was partial because of his employment status as a retiree of FWP.

¶16 On July 18, 2002, the District Court issued an order granting the FCD's and FWP's motion for judgment on the pleadings, and, after the Paulsons moved to reconsider, reaffirmed that judgment on September 26, 2002. The Paulsons appeal.

**STANDARD OF REVIEW**

¶17 A movant for judgment on the pleadings pursuant to Rule 12(c), M.R.Civ.P., must establish that no material issue of fact remains and that the movant is entitled to judgment

6

as a matter of law. *Hedges v. Woodhouse*, 2000 MT 220, ¶ 8, 301 Mont. 180, ¶ 8, 8 P.3d 109, ¶ 8 (citing *Clayton v. Atlantic Richfield Co.* (1986), 221 Mont. 166, 169-70, 717 P.2d 558, 560). The pleadings are to be construed in the light most favorable to the nonmoving party, whose allegations are taken as true. *Hedges*, ¶ 8. Because a motion for judgment on the pleadings is decided as a matter of law, we apply our standard of review for conclusions of law: whether they are correct. *Hedges*, ¶ 8 (citing *Steer, Inc. v. Dept. of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603).

¶18    Judicial review of arbitration awards is limited by statute. *Terra West Townhomes, L.L.C. v. Stu Henkel Realty*, 2000 MT 43, ¶ 22, 298 Mont. 344, ¶ 22, 996 P.2d 866, ¶ 22 (citing *Nelson v. Livingston Rebuild Ctr., Inc.*, 1999 MT 116, ¶ 11, 294 Mont. 408, ¶ 11, 981 P.2d 1185, ¶ 11). When a matter has been submitted to binding arbitration, courts are not permitted to review the merits of the controversy, but may only confirm, vacate, modify, or correct an arbitration award pursuant to §§ 27-5-311, -312, and -313, MCA. *See* §§ 27-5-311 to -313, MCA (2003); *Nelson*, ¶ 11. The standard of review for a court's refusal to modify or vacate an arbitration award is whether the court abused its discretion. *See Stockade Enters. v. Ahl* (1995), 273 Mont. 520, 522, 905 P.2d 156, 157.

## DISCUSSION

### Issue 1

¶19    *Did the District Court err in concluding that the arbitration panel validly determined factual and legal issues in accordance with the arbitration provisions of The Natural Streambed and Land Preservation Act of 1975?*

7

¶20   On appeal, the Paulsons challenge the arbitration panel's authority to determine jurisdiction. Specifically, the Paulsons argue that the question of whether the Streambed Act as applied by the FCD or the Lakeshore Program as applied by the FRDO is a jurisdictional question of law for the District Court, rather than the arbitration panel, to decide. Conversely, the FCD contends that a conservation district can make the initial legal determination of the status of a body of water and, accordingly, an arbitration panel can review that determination because, under the arbitration process, it has authority to hear and resolve all issues, both factual and legal, arising from the conservation district's decision.

¶21   The Paulsons specifically contend that the arbitration panel was without authority to decide the "basic jurisdictional question" presented in § 75-7-103, MCA, and § 75-7-202, MCA, as to whether the situs of their project was a lake or a stream. The Streambed Act, § 75-7-103, MCA, defines "stream" as "any natural, perennial-flowing stream or river, its bed, and its immediate banks except a stream or river that has been designated by district rule as not having significant aquatic and riparian attributes in need of protection or preservation under 75-7-102." The Lakeshore Program, § 75-7-202, MCA, defines "lake" as:

> [A]  body of standing water and the area within its lakeshore occurring naturally rather than by virtue of constructed impoundments (although a natural lake whose level is raised and whose area is increased by the construction of impoundments includes the additional level and area), having a water surface of at least 160 acres for at least 6 months in a year of average precipitation as such averages are determined by the United States geological survey, not used exclusively for agricultural purposes, and navigable by canoes and small boats.

8

The Paulsons contend that the interpretation of these two statutes as applied to the question of whether their construction project was located on Flathead Lake or the Swan River, was properly a jurisdictional determination for the District Court, not the arbitration panel.

¶22 Generally, Montana gives arbitrators broad authority and powers to determine all issues. This Court stated in *Terra West* that the power of arbitrators as applied to bodies of law is broader even than the power of courts: "Indeed, the power of arbitrators concerning every body of law is broader than the power of courts concerning those same bodies of law." *Terra West*, ¶ 31. Under the Streambed Act, an arbitration panel is charged with the responsibility of reviewing all decisions of an agency through its supervisors. *See* § 75-7-121, MCA ("any review of final action by the supervisors . . . may be by arbitration"). We have stated that an arbitrator may decide the matters which are submitted to him, and the decision will be upheld upon review if it was rationally derived from the agreement to arbitrate:

> An arbitrator's authority is limited by the bounds of the [arbitration] agreement, and courts may vacate [arbitration] awards that extend beyond the contractual scope of arbitration. An arbitrator exceeds his powers when he decides matters which were not submitted to him. . . . Moreover, we have stated that "[i]f the remedy fashioned by the arbitrator has been rationally derived from the [arbitration] agreement it will be upheld on review."

*Terra West*, ¶ 27 (citing *Nelson,* ¶ 15).

¶23 Significantly, arbitrators have the power to review issues of *both fact and law*. Section 75-7-114, MCA, empowers an arbitration panel "to settle the dispute before it," regardless of whether the issues involve fact or law. *See also Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 30, 310 Mont. 123,¶ 30, 54 P.3d 1, ¶ 30 (factors listed by this Court

9

for determining unconscionability in arbitration provision in contract of adhesion include, *inter alia*, to what extent arbitrators are bound *by the facts* and to what extent arbitrators are bound *by the law*).

¶24 The Paulsons' appeal was brought before the District Court for the purpose of judicial review that is provided in § 75-7-121, MCA (2001),[1] a part of the Streambed Act. Section 75-7-121, MCA, provides that a party who disagrees with a decision of the supervisors of a conservation district must appeal that decision to a panel of arbitrators. Following the arbitrators' decision, it can be reviewed by the district court. However, judicial review of the arbitration award is strictly limited by § 27-5-312, MCA, of the Uniform Arbitration Act. *See* § 75-7-121, MCA ("[j]udicial review of an arbitration action is under the provisions of Title 27, chapter 5, part 3"). In *Geissler v. Sanem* (1997), 285 Mont. 411, 415-16, 949 P.2d 234, 237, this Court delineated the scope of those limitations:

> We stated in both *Duchscher v. Vaile* (1994), 269 Mont. 1, 4, 887 P.2d 181, 183, and *May v. First Nat'l Pawn Brokers, Ltd.* (1994), 269 Mont. 19, 22, 887 P.2d 185, 187, that judicial review of an arbitration award is strictly limited by statute. *See also Stockade Enters. v. Ahl* (1995), 273 Mont. 520, 522-23, 905 P.2d 156, 157. Section 27-5-312(1), MCA, states in relevant part that "the district court shall vacate an award if . . . there was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party; [or] . . . the arbitrators exceeded their powers." . . . As we stated in *Duchscher*, 269 Mont. at 5, 887 P.2d at 184, "[t]he Montana Uniform Arbitration Act clearly does not authorize judicial review of arbitration awards on the merits of the controversy."

---

[1]Section 75-7-121(1), MCA (2001), was revised by the 2003 Legislature to state: "Any review of final action by the supervisors under 75-7-112 or 75-7-113 may be by arbitration or by the district court of the county where the project is located." The 2003 revision is not applicable in this matter.

*Geissler*, 285 Mont. at 415-16, 949 P.2d at 237. Additionally, in *Geissler*, we adopted the "manifest disregard of the law" standard of review for vacating arbitration decisions. For reversal under this standard, an arbitrator must have been aware of a clearly governing principle of Montana law, but "blatantly refuse[d] to follow it." *Geissler*, 285 Mont. at 416, 949 P.2d at 238.

¶25    This Court has previously addressed the same issue which the Paulsons now raise on appeal: whether a conservation district had the authority to determine its own jurisdiction in a dispute involving classification of a body of water as a "stream." In *Bitterroot River Prot. Ass'n, Inc., v. Bitterroot Conservation Dist.*, 2002 MT 66, 309 Mont. 207, 45 P.3d 24, the issue before the Court was whether the Bitterroot Conservation District (BCD) had the authority to make the initial determination of whether the Mitchell Slough was a "natural, perennial-flowing stream" as part of the routine permit process. We noted in *Bitterroot* that although the code fails to assign to any specific entity the necessary task of identifying the legislature's articulated requirement of "natural, perennial-flowing stream," numerous cases supported the rule that "a court should allow an agency to determine initially whether it has jurisdiction." *Bitterroot*, ¶¶ 14-15 (citing *Wilson v. Dept. of Pub. Serv. Regulation* (1993), 260 Mont. 167, 171, 858 P.2d 368, 370; *General Atomics v. United States Nuclear Regulatory Comm'n* (9th Cir.1996), 75 F.3d 536, 541; *Lone Star Cement Corp. v. Federal Trade Comm'n* (9th Cir.1964), 339 F.2d 505, 509-10; *Marshall v. Burlington Northern, Inc*. (9th Cir.1979), 595 F.2d 511, 513; *Marshall v. Able Contractors*, *Inc.* (9th Cir.1978), 573

11

F.2d 1055, 1057; *California ex rel. Christiensen v. Federal Trade Comm'n* (9th Cir.1977), 549 F.2d 1321, 1323).

¶26 In *Bitterroot*, we applied the following three-part test from *Marshall v. Burlington Northern* for determining whether a court may "interfere" with an agency's initial determination of its jurisdiction:

> (1) the agency's jurisdiction is plainly lacking;
> (2) clear evidence exists that requiring a party to exhaust its remedies will result in irreparable injury;
> (3) the agency's special expertise will be of no help on the question of its jurisdiction.

*Bitterroot,* ¶ 15 (citing *Burlington Northern*, 595 F.2d at 513). We noted, however, that in practice, "courts have rarely found instances where a party overcomes these three hurdles," and, indeed, concluded that the appellant in *Bitterroot* did not overcome them. *Bitterroot*, ¶ 15. We concluded in *Bitterroot*: (1) that the BCD's jurisdiction was not plainly lacking: "The most logical interpretation . . . [was] to allow the BCD to make the initial determination of a stream's status. Otherwise, until some entity classifie[d] the Mitchell Slough as a stream, the BCD presumably could not regulate projects or grant permits as the Streambed Preservation Act authorize[d] it to do . . ."; (2) that allowing the BCD to determine whether it had jurisdiction to classify the Mitchell Slough as a "natural, perennial-flowing stream" would not cause irreparable injury because applicants who disagreed with an adverse decision could seek judicial review under § 2-3-113, MCA, or through a writ of review pursuant to § 27-25-102(2), MCA; and, (3) that the BCD's expertise was not clearly without value in making the determination regarding Mitchell Slough because of its

12

unquestioned ability to determine what bodies of water lie outside of its jurisdiction. *Bitterroot*, ¶¶ 16-19.

¶27     Since the Paulsons have not alleged the arbitration panel misapplied the law, thus invoking the "manifest disregard of the law" standard, but have challenged its assertion of jurisdiction, we review the District Court's decision for an abuse of discretion. *Stockade Enters.*, 273 Mont. at 522, 905 P.2d at 157.

¶28     *Bitterroot* is dispositive of this issue. First, like the BCD in *Bitterroot*, the FCD's jurisdiction was not plainly lacking. Although the Streambed Act does not explicitly state that the FCD may answer the initial jurisdictional question as to which streams are "natural, perennial-flowing," we conclude, as we did in *Bitterroot*, that the most logical interpretation of the Streambed Act is to allow the FCD to determine what bodies of water are streams pursuant to § 75-7-103(6), MCA. Otherwise, until some other entity classifies the area in question in Bigfork Bay as a "stream," the FCD presumably could not regulate projects or grant permits as the Streambed Act authorizes it to do. As we stated in *Bitterroot*, "[h]aving the same entity decide what is a stream and conversely decide what is not a stream is more logical than having a district court or other entity decide the former and the BCD decide the latter." *Bitterroot*, ¶ 17. We believe the same holds true here. Second, allowing the FCD to determine whether it has jurisdiction to classify the project situs as the Swan River will not cause irreparable injury because of the aforementioned remedies available in § 2-3-113, MCA, and § 27-25-102(2), MCA, for reviewing agency rulings. And, third, the FCD's expertise is not clearly without value here. The record indicates that, historically, since the

1970s when the Streambed Act was adopted, the FCD has asserted concurrent jurisdiction with the FRDO over Bigfork Bay, the situs of the Paulsons' project. Regardless of how the Lakeshore Program is applied, the Streambed Act has its own regulatory scheme that requires a person proposing a project on a "natural, perennial-flowing stream or river" to obtain a permit from the local conservation district. Application of the Lakeshore Program does not preclude application of the Streambed Act to a particular area, especially in situations where, as here, a construction project may be located simultaneously in a lake and where a river once flowed before lake waters were expanded as a result of construction of a dam.

¶29     Therefore, we conclude that the District Court did not abuse its discretion in granting judgment on the pleadings to the FCD and FWP because no material issue of fact existed that could have established that the arbitration panel was without authority to determine questions of fact and law in resolving the initial question of jurisdiction, and, as a matter of law, jurisdiction was properly exercised by the panel.

**Issue 2**

¶30     *Did the District Court err in concluding Delano A. Hanzel was a neutral arbiter?*

¶31     The Paulsons further assert that one of the arbiters, Delano A. Hanzel, was not neutral by virtue of being a retiree from FWP, one of the agencies involved in the arbitration process, and therefore should have been excluded from the panel because of his prior employment status. Respondents FCD and FWP reply that no provision of law requires an arbitrator's exclusion from the panel on the basis of prior employment, and, because the

14

Paulsons' motion to vacate contained no other allegations of partiality, the Paulsons have not stated a cause of action on this claim.

¶32    Arbitrators must be selected according to § 75-7-114, MCA, and Rule 2 of the Streambed Act Rules of Arbitration. Section 75-7-114, MCA, states:

> **75-7-114. Arbitration panel - selection.** The arbitration panel shall consist of three members chosen by the senior judge of the judicial district in which the dispute takes place. The members must be residents of that judicial district at the time of selection . . . .

Arbitration Rule 2 of the Streambed Act states:

> **Rule 2. Selection of the Arbitration Panel.** Within thirty (30) days of the request for arbitration, each team member must submit the names and qualifications of three consenting persons to the administering agency. The senior district judge for the judicial district of the conservation district involved will select three panel members, one from each team member's group of names . . . .

The above statute and rule governing the choice of members for the arbitration panel contain only two requirements: (1) members must be residents of that judicial district at the time of selection, and (2) the senior district judge for the judicial district of the conservation district involved will select three panel members, one from each team member's group of names.

¶33    The burden of proof in establishing a statutory basis for vacating an arbitration award is on the party attacking the award, here the Paulsons. *May*, 269 Mont. at 25, 887 P.2d at 189. Section 27-5-312(1)(b), MCA, provides:

> **27-5-312. Vacating an award.** (1) Upon the application of a party, the district court shall vacate an award if:
> . . .
> (b) there was *evident partiality* by any arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

15

(Emphasis added.) "The partiality which will suffice to vacate an arbitration award must be certain, definite and capable of demonstration; alleged partiality which is remote, uncertain or speculative is insufficient." *May*, 269 Mont. at 25, 887 P.2d at 189.

¶34  Arbiter Hanzel met the two criteria set forth in § 75-7-114, MCA, and Arbitration Rule 2: (1) he was a resident of the judicial district at the time of selection, and (2) Senior District Judge Lympus selected him as one of three panel members from the group of names submitted by the three team members. Additionally, this Court has previously held that employment status is insufficient, of itself, to establish partiality. *See e.g. State v. Radi* (1978), 176 Mont. 451, 460, 578 P.2d 1169, 1175 (court found no statute permitted automatic challenge for cause solely on the basis prospective juror was also a county officer); *State v. Thomson* (1976), 169 Mont. 158, 163, 545 P.2d 1070, 1073 (followed in *State v. Deschon*, 2004 MT 32, ¶ 41, 320 Mont. 1, ¶ 41, 85 P.3d 756, ¶ 41) (court found prospective juror's connection with law enforcement did not, without more, necessitate finding of partiality). Thus, the Paulsons' argument amounts to a speculative and conclusory allegation of partiality rather than the direct and demonstrable evidence of partiality required to vacate an award. We conclude that the Paulsons' partiality allegations relating to Delano A. Hanzel do not establish "evident partiality" under § 27-5-312(1)(b), MCA. We conclude, therefore, that the District Court did not abuse its discretion in refusing to vacate the award on that basis.

**Issue 3**

¶35  *Was the arbitration process constitutional?*

16

¶36    On appeal, the Paulsons assert that the arbitration process to which they were required to submit under the Streambed Act is unconstitutional.  They contend the fact the Streambed Act provides for arbitration as its sole appellate remedy, whereas the Lakeshore Program provides judicial review as an appellate remedy, constitutes an equal protection violation.  Further, the Paulsons contend the process of promulgating the Streambed Act was unconstitutional because the public had no voice in developing the process.

¶37    However, the Paulsons raise this as an issue for the first time on appeal.  It is well established that this Court will not review an issue that was not raised in the district court.  "[I]t is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider."  *Day v. Payne* (1996), 280 Mont. 273, 276, 929 P.2d 864, 866.  Accordingly, we summarily decline to address the merits of the Paulsons' equal protection argument on appeal.

¶38    The Paulsons also raise the argument that the arbitration provision in the Streambed Act exceeded the reasonable expectations of the parties and was compulsory, oppressive, and unconscionable.  In support of this argument, the Paulsons rely on our decision in *Kloss* which determined that a contract of adhesion will not be enforced against a weaker party when it is: "(1) not within the reasonable expectations of said party, or (2) within the reasonable expectations of the party, but, when considered in its context, is unduly oppressive, unconscionable or against public policy."  *Kloss*, ¶ 23.

¶39    However, like their equal protection challenge, the Paulsons did not properly preserve this issue.  Even if we were to concede that they raised a similar argument in their brief in

17

opposition to the Respondents' motion, this argument was not raised in the pleadings, fully briefed by the parties, nor addressed by the District Court. Thus, it is both untimely and not properly preserved for appeal. Moreover, Paulsons neither presented nor litigated this issue prior to the arbitration process itself. This Court has specifically held that waiver may result from acts or conduct which induce the belief that a party's intention and purpose is to waive:

> [A] right may be waived by implication as well as by agreement. Although waiver is mainly a question of intention and must be manifested in some unequivocal manner, a waiver may be founded upon express written statements, oral express statements or acts or conduct which induce the belief that the intention and purpose is to waive.

*Thiel v. Johnson*, 219 Mont. 271, 275, 711 P.2d 829, 832 (citing *Northwestern Fire & Marine Ins. Co. v. Pollard* (1925), 74 Mont. 142, 148, 238 P. 594, 596). We conclude that the Paulsons' act of requesting the very process to which they now object, and in which they completely participated without objection, waived their right to challenge its constitutionality on appeal.

¶40 The Paulsons finally request that this Court conduct a plain error review of the constitutionality of the arbitration process. We have held that we may discretionarily review a claimed error not previously raised in the district court which affects fundamental constitutional rights where failing to review it may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process. *State v. Finley* (1996), 276 Mont. 126, 137, 915 P.2d 208, 215, *overruled in part on other grounds*; § 46-20-701(2), MCA. However, we further held in *Finley* that we will use our inherent power of plain error review sparingly and only in

18

exceptional cases meeting one of the above criteria. *Finley,* 276 Mont. at 138, 915 P.2d at 215. Based on our review of the record, which reveals that the Paulsons affirmatively requested to participate in the arbitration process, we conclude that this is not one of those exceptional cases warranting plain error review.

¶41   We affirm the District Court on all issues.


                                                    /S/ JIM RICE


We concur:

/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA O. COTTER