
DA 23-0225

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 3

MONTANA ENVIRONMENTAL INFORMATION
CENTER and SIERRA CLUB,

     Plaintiffs, Appellees,
     and Cross-Appellants,

   v.

MONTANA DEPARTMENT OF ENVIRONMENTAL
QUALITY and NORTHWESTERN ENERGY, INC.,

     Defendants, Appellants,
     and Cross-Appellees,

STATE OF MONTANA, by and through
the OFFICE OF THE ATTORNEY GENERAL,

     Intervenor-Defendant and Appellant.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
                 In and For the County of Yellowstone, Cause No. DV-21-1307
                 Honorable Michael G. Moses, Presiding Judge

COUNSEL OF RECORD:

     For Appellant Montana Department of Environmental Quality:

          Jeremiah Langston (argued), Samuel J. King, Montana Department of
          Environmental Quality, Helena, Montana

     For Appellant Northwestern Corporation:

          Shannon Heim (argued), John Tabaracci, Northwestern Corporation,
          Helena, Montana

          Harlan B. Krogh, John G. Crist, Crist, Krogh, Alke & Nord PLLC,
          Billings, Montana

For Appellant State of Montana:

Austin Knudsen, Montana Attorney General, Michael D. Russell, Michael Noonan, Assistant Attorneys General, Helena, Montana

Emily Jones, Jones Law Firm, PLLC, Billings, Montana

For Appellees Montana Environmental Information Center and Sierra Club:

Amanda D. Galvan, Jenny K. Harbine (argued), Earthjustice, Bozeman, Montana

For Amicus Curiae: 16 Youth Plaintiffs in *Held v. State of Montana*:

Roger Sullivan, McGarvey Law, Kalispell, Montana

Barbara Chillcott, Melissa Hornbein, Western Environmental Law Center, Helena, Montana

Argued and Submitted: May 15, 2024
Decided: January 3, 2025

Filed:

_____
Clerk

2

Justice Beth Baker delivered the Opinion of the Court.

¶1 NorthWestern Corporation and the Montana Department of Environmental Quality (DEQ) appeal the Thirteenth Judicial District Court's order vacating the air quality permit that DEQ granted NorthWestern for a natural-gas-fueled power plant near Laurel, Montana. The District Court vacated the permit after finding DEQ's analysis under the Montana Environmental Policy Act (MEPA) inadequate with respect to the project's lighting impacts and greenhouse gas emissions. We affirm in part and reverse and remand in part. We address four issues on appeal:

1. *Did the District Court err in concluding that DEQ's noise analysis was not arbitrary or capricious?*

2. *Did the District Court err in concluding that DEQ failed to take the requisite "hard look" at the facility's lighting impacts?*

3. *Did the District Court err in concluding that MEPA requires DEQ to analyze greenhouse gas emissions as part of its air quality permitting process?*

4. *Did the District Court err in vacating the permit without making specific findings under § 75-1-201(6)(c)(ii), MCA?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2 NorthWestern filed an air quality permit application with DEQ in May 2021 pursuant to §§ 75-2-204 and -211, MCA, of the Clean Air Act of Montana and the air quality permit application requirements under the Administrative Rules of Montana (Admin. R. M.) 17.8.748 (2002). The permit application sought permission to construct, operate, and maintain the Laurel Generating Station (LGS) near Laurel. The proposed site was about 300 feet north of the Yellowstone River.

3

¶3 Eighteen reciprocating internal combustion engines (RICE)—which burn natural gas pumped in by a pipeline—would power the LGS. Each of the eighteen RICE has its own exhaust stack rising more than seventy feet in the air. NorthWestern estimated that the plant, when operating at maximum capacity, would emit the following pollutants regulated by DEQ under the Clean Air Act: 75 tons per year of particulate matter ($PM_{10}$); 28 tons per year of particulate matter ($PM_{2.5}$); 222 tons per year of nitrogen oxides ($NO_X$); 246 tons per year of carbon monoxide (CO); 215 tons per year of volatile organic compounds (VOC); 14 tons per year of sulfur dioxide ($SO_2$); and 93 tons per year of hazardous air pollutants (HAPs). Additionally, the plant would emit around 769,706 tons of carbon dioxide equivalent ($CO_2e$) per year. $CO_2e$ is commonly referred to as greenhouse gases (GHGs). *See Held v. State*, 2024 MT 312, ¶¶ 3-4, 419 Mont. 403, ___ P.3d ___ (describing some Montana-specific environmental effects of GHG emissions).

¶4 After NorthWestern submitted its permit application, DEQ prepared an Environmental Assessment (EA) under MEPA and the applicable administrative rules. On July 9, 2021, DEQ released a preliminary determination proposing to grant the permit, a draft permit, and a five-page draft EA. It opened a public comment period on the drafts and preliminary determination. DEQ received around 700 comments. The public comments overwhelmingly expressed concerns about the environmental impacts of the LGS. Plaintiffs Montana Environmental Information Center and Sierra Club (collectively MEIC) submitted a 26-page comment letter expressing numerous substantive and procedural concerns, including the argument that DEQ's Draft EA failed to comply with MEPA requirements. On August 23, 2021, DEQ issued an air quality permit to

NorthWestern that included agency responses to the comments. DEQ also released a 23-page final EA. In this second EA, DEQ explained that it did not evaluate the LGS's GHG emissions because GHGs are not currently regulated by the Montana Air Quality Bureau.

¶5 On October 27, 2021, MEIC filed its first amended complaint challenging the LGS air quality permit and DEQ's failure to take a "hard look" at the gas plant's impacts regarding a pipeline, water quality, and aesthetic (visual, light, and noise) impacts, as well as the cumulative impacts of $SO_2$ emissions and the impacts of greenhouse gas emissions. In the alternative, MEIC argued that reading MEPA requirements under § 75-1-201(2)(a), MCA, to foreclose consideration of all climate change impacts, including those in Montana, violates Montana constitutional environmental protections under Article II, Section 3 and Article IX, Section 1, of the Montana Constitution. After answers by DEQ and NorthWestern, the State of Montana moved to intervene to address any potential constitutional challenges. All parties filed summary judgment motions and briefing, and the District Court held a hearing in June 2022.

¶6 On April 6, 2023, the District Court granted summary judgment to DEQ and NorthWestern on the pipeline, water quality, and noise impacts, as well as the miscellaneous aesthetic impacts and the cumulative impacts of $SO_2$. The District Court granted summary judgment to MEIC on both the lighting issue and DEQ's failure to analyze greenhouse gas emissions. The court further stated that until DEQ completed its MEPA responsibilities, the significance determination of whether an Environmental Impact Statement (EIS) was warranted was not ripe for decision. The District Court

remanded the EA to DEQ for further analysis and vacated the air quality permit pending MEPA-compliant analysis by DEQ.

¶7 NorthWestern then moved to stay the vacatur of the air quality permit pending appeal. On May 10, 2023, the Governor signed into law House Bill (HB) 971, which amended § 75-1-201(2)(a), MCA, to prohibit the evaluation of GHG emissions during MEPA reviews within or beyond the State's borders (subject to narrow exceptions). 2023 Mont. Laws ch. 450, § 1. Separately, a group of plaintiffs filed suit challenging the constitutionality of those 2023 amendments. We have now held in that case that § 75-1-201(2)(a), MCA (2023), is facially unconstitutional for prohibiting state agencies in all cases from considering GHG emissions in their environmental reviews. *Held*, ¶ 68.

¶8 On May 16, 2023, this Court reversed an Eleventh Judicial District Court order vacating a permit for non-compliance with MEPA without following the exclusive provisions of § 75-1-201(6)(c), MCA (2021).[1] *Water for Flathead's Future, Inc. v. Mont. Dep't of Env't Quality*, 2023 MT 86, ¶¶ 10, 36-37, 412 Mont. 258, 530 P.3d 790. Relying in part on this Court's holding in *Water for Flathead's Future*, the District Court granted a stay of its April 2023 order. MEIC did not seek review of the stay order in this Court.

¶9 NorthWestern argues on appeal that DEQ performed a sufficient analysis of lighting impacts. NorthWestern further contends the District Court erred when it concluded that DEQ must analyze GHG emission effects within Montana's borders because DEQ does not have lawful authority to prevent GHG emissions, and HB 971 moots any requirement

---

[1] All references are to the 2021 MEPA statutes of the MCA unless otherwise indicated.

by DEQ to analyze GHG emissions effects. DEQ and NorthWestern argue on appeal that the District Court erred when it vacated DEQ's permit without making findings required by § 75-1-201(6)(c)(ii), MCA. MEIC cross-appeals on the grounds that DEQ failed to adequately evaluate noise impacts and that reading § 75-1-201(2)(a), MCA, as precluding climate change analysis within Montana's borders is unconstitutional.[2]

¶10 On May 15, 2024, this Court heard oral argument on the parties' appeals.

## STANDARDS OF REVIEW

¶11 This Court reviews a summary judgment ruling, and related conclusions of law, de novo. *Bitterrooters for Planning, Inc. v. Mont. Dep't of Env't Quality*, 2017 MT 222, ¶ 15, 388 Mont. 453, 401 P.3d 712.

¶12 When reviewing an agency's decision under MEPA, however, our standard of review is generally narrow. *Clark Fork Coal. v. Mont. Dep't of Env't Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482. We afford "great deference to agency decisions implicating substantial agency expertise," and we cannot "substitute [our] judgment for that of an agency." *Mont. Env't Info. Ctr. v. Mont. Dep't of Env't Quality*, 2019 MT 213, ¶ 20, 397 Mont. 161, 451 P.3d 493 (*MEIC 2019*) (citations and internal quotations omitted). We thus limit our review to whether the agency decision was "arbitrary, capricious, unlawful, or not supported by substantial evidence." *Clark Fork Coal.*, ¶ 21. Substantial evidence means "more than a mere scintilla of evidence but may be less than a preponderance." *Mont. Trout Unlimited v. Mont. Dep't of Env't Quality*, 2024 MT 36,

---

[2] Because we resolve the appeal on statutory grounds, we do not reach the constitutional question in this case.

¶ 11, 415 Mont. 214, 544 P.3d 163 (citation omitted). We do not "merely defer to the agency without close review of the record" but must be satisfied "that the agency made a reasoned decision without clear error of judgment." *Mont. Trout Unlimited*, ¶ 11. Our focus is "on the administrative decision-making process rather than the decision itself." *Water for Flathead's Future*, ¶ 11. "[T]he person challenging the [agency's] decision has the burden of proving the claim by clear and convincing evidence contained in the record." Section 75-1-201(6)(a)(i), MCA.

## DISCUSSION

¶13   *1. Did the District Court err in concluding that DEQ's noise analysis was not arbitrary or capricious?*

¶14   MEPA requirements are procedural and "do not require an agency to reach any particular decision in the exercise of its independent authority." *Bitterrooters*, ¶ 18 (citing § 75-1-201(1), MCA; *Mont. Wildlife Fed'n v. Mont. Bd. of Oil & Gas Conservation*, 2012 MT 128, ¶ 32, 365 Mont. 232, 280 P.3d 877). MEPA compliance requires that agencies take a "hard look" at a project's environmental impacts. *Mont. Trout Unlimited*, ¶ 18 (citing *Mont. Wildlife Fed'n*, ¶ 43). Courts do not themselves take the hard look, but instead focus "on the validity and appropriateness of the administrative decision-making process without intense scrutiny of the decision itself." *Mont. Trout Unlimited*, ¶ 18 (quoting *Mont. Wildlife Fed'n*, ¶ 43). "Our concern when reviewing an assessment under MEPA is whether the agency made a reasoned decision after carrying out its MEPA responsibilities in full." *Belk v. Mont. Dep't of Env't Quality*, 2022 MT 38, ¶ 26, 408, Mont. 1, 504 P.3d 1090 (citing *Clark Fork Coal.*, ¶ 21). "Implicit in the requirement

8

that an agency take a hard look at the environmental consequences of its actions is the obligation to make an adequate compilation of relevant information, to analyze it reasonably, and to consider all pertinent data." *Belk*, ¶ 26 (quoting *Clark Fork Coal.*, ¶ 47). "Among the environmental consequences that DEQ must address under MEPA are aesthetic and recreational impacts." *Belk*, ¶ 26 (citing Admin. R. M. 17.4.609[3] [1989]).

¶15 The District Court found that DEQ took a sufficiently "hard look" at noise impacts. MEIC argues that DEQ's MEPA analysis failed to "meaningfully analyze and disclose the noise impacts on nearby communities." It contends that including only one measurement of noise volume was insufficient and that the EA failed to include the following: the additive effect of the plant's noise with other industrial activity; impacts to residents living in a neighborhood south of the Yellowstone River; and the severity, duration, geographic extent, and cumulative impacts as required by Admin. R. M. 17.4.608(1)(a) and 17.4.609(3)(e). Public comments also included a letter from a resident south of the Yellowstone River describing concerns over noise impacts.

¶16 DEQ and NorthWestern contend that MEIC fails to argue why the measurement of volume was insufficient. They add that, because DEQ concluded any noise impact would be insignificant on a residence located approximately 1,030 feet away from the plant, it was rational to not study the residences south of the Yellowstone River approximately 2,300 feet away.

¶17 We carefully review the record to ensure the agency made a reasoned decision. *Clark Fork Coal.*, ¶ 21. Whether the agency took a "hard look" requires contemplating "the entirety of DEQ's rationale." *Mont. Trout Unlimited*, ¶ 93. The Draft EA did not

9

include any reference to noise impacts. After the comment period raised concerns about noise (both through the MEIC letter and the nearby resident's letter), DEQ requested NorthWestern to provide any completed noise studies. NorthWestern provided a preliminary engineering analysis it contended complied with established noise criteria for far-field noise emissions. The study measured noise levels from four cardinal points in relation to the engine hall and found that noise emissions would all be at 65 A-weighted decibels (dBA) or less within 600 feet from the engine hall. The study additionally listed four separate noise mitigation measures that NorthWestern would include. DEQ incorporated this study and the mitigation techniques into the final EA under the aesthetics section. DEQ's final EA referenced noise in three different sections: aesthetics, health and human safety, and access to recreational activities. DEQ identified the two closest residences as approximately 1,030 feet and 1,230 feet from the engine hall. The nearest other residences are across the Yellowstone River, with the closest of those being about 2,300 feet from the engine hall.

¶18 DEQ cited the specific findings of the NorthWestern study ("[t]his project is considered to be short-term with far-field noise specification estimates less than or equal to 65 A-weighted decibels (dBA)" at 600 feet west, north, and south, and 555 feet east). Based on this study, DEQ reasoned that "[a]ll reported noise estimates are within NorthWestern property boundaries and noise beyond these distances would drop." In a separate section on human health and safety, DEQ concluded that, based on the study, noise levels "do not exceed any OSHA exposure limits at the property boundary with the

10

mitigation" measures. In a separate section on recreational and wilderness activities, DEQ stated:

> [r]ecreationalists on the Yellowstone River and at Riverside Park could be able to see the stacks of the RICE intermittently and would likely hear a steady noise from the RICE operation including noise from the velocity of discharge exhaust running flowing [sic] through the stack ductwork. The noise would be similar in nature to the existing CHS Refinery nearby. If a receptor were to increase their distance from the proposed action, noise and visual impacts would decrease.

¶19 MEIC argues DEQ failed to analyze impacts further out at the nearby residences. MEIC further contests DEQ's failure to conduct studies of how the noise from the LGS would combine with other industrial plants in the area to affect residences. MEIC contends that DEQ erred because it stated the project's noise would be like existing noise from the nearby refinery. Thus, MEIC argues, the EA failed to assess the additive effect of the plant's noise with other industrial activity. Although the presence of other industrial activity does not insulate an agency from analyzing the cumulative impacts of industrialization, *see Mont. Wildlife Fed'n*, ¶ 49, DEQ's decision not to conduct additional testing was based on its evaluation of the noise study showing that all installed equipment complies with the established noise criteria for far-field noise emissions, the proposed mitigation techniques, and the relevant OSHA guidelines. Because DEQ supported its conclusion with the testing data and determined that the noise level satisfied OSHA's objective health and safety benchmark, we conclude that DEQ's decision not to conduct additional studies at greater distances was not arbitrary or unreasonable. *Mont. Trout Unlimited*, ¶ 93 (noting that an agency decision is not arbitrary and capricious when it has

considered relevant data, articulated a reasoned explanation for its rationale, and supported its determination with substantial evidence).

¶20 The agency provided a reasoned analysis. We will not substitute our own judgment for the agency's decision, and we will not find an agency decision to be arbitrary or capricious even if "the record contains evidence which might support a different result." *Mont. Trout Unlimited*, ¶ 12 (citations omitted).

¶21 MEIC does not contest the study's finding of 65 dBA or explain why that finding would warrant further studies. Analyzing the significance of 65 dBA at 600 feet versus 1000 feet, and whether further studies are necessary for noise impacts at varying distances from different sources, highlights the reason courts defer to agency expertise. *See Park Cnty. Env't Council v. Mont. Dep't of Env't Quality*, 2020 MT 303, ¶ 43, 402 Mont. 168, 477 P.3d 288 ("The process of assigning relative weights to conflicting data for predictive purposes is essentially a technical exercise requiring agency expertise that should be afforded substantial deference."); *MEIC 2019*, ¶ 26 ("This Court acknowledges that agencies have specific, technical, and scientific knowledge surpassing . . . the Court's.").

¶22 The record shows that DEQ examined relevant data and articulated why it did not conduct further studies on noise impacts. MEIC has not met its burden to demonstrate that DEQ failed to take a "hard look."

¶23 *2. Did the District Court err in concluding that DEQ failed to take the requisite "hard look" at the facility's lighting impacts?*

12

¶24     We first address NorthWestern's argument that MEIC failed to preserve its lighting objection during the comment period and thus could not raise it before the District Court.[3] A party must exhaust administrative remedies before seeking judicial relief. *Flowers v. Bd. of Pers. Appeals, Mont. Dep't of Fish, Wildlife & Parks*, 2020 MT 150, ¶ 8, 400 Mont. 238, 465 P.3d 210. Exhaustion allows the agency to "make a factual record and to correct its own errors within its specific expertise before a court interferes." *Flowers*, ¶ 8 (quoting *Bitterroot River Prot. Ass'n v. Bitterroot Conservation Dist.*, 2002 MT 66, ¶ 22, 309 Mont. 207, 45 P.3d 24). "For a case to be ripe for judicial review, each individual issue must have been properly raised, argued, or adjudicated pursuant to the administrative process." *Flowers*, ¶ 8 (citing *Marble v. State*, 2000 MT 240, ¶ 27, 301 Mont. 373, 9 P.3d 617).

¶25     Applicable here, § 75-1-201(6)(a)(ii), MCA (2021) (now codified as § 75-1-201(6)(a)(iii), MCA (2023)) outlines the exhaustion requirements for a MEPA challenge. Subject to certain exceptions, "a court may not consider any information, including but not limited to an issue, comment, argument, proposed alternative, analysis, or evidence, that was not first presented to the agency for the agency's consideration prior to the agency's decision or within the time allowed for comments to be submitted." Section 75-1-201(6)(a)(ii), MCA.

¶26     NorthWestern and MEIC dispute whether public comments were sufficiently specific to present the issue to the agency and thus satisfy MEPA issue preservation and

---

[3] NorthWestern did not raise the issue exhaustion argument at the District Court. Because we hold that the issue was minimally preserved at the administrative level, we decline to address whether a party may raise an issue exhaustion argument for the first time on appeal.

13

administrative exhaustion requirements under § 75-1-201(6)(a)(ii), MCA. We considered a similar question in *Montana Trout Unlimited* after plaintiffs challenged a DEQ permit for a mine. *Mont. Trout Unlimited,* ¶ 19. We determined that the Plaintiffs "minimally preserved" their challenge to the "flowability" of cemented mine tailings because even though the comments arose in the context of a different issue, "their substance indicate[d] that the public was concerned about, and DEQ addressed, the structural integrity of the surface tailings." *Mont. Trout Unlimited*, ¶¶ 20-21. Comments likewise preserved a liquefaction issue because "despite not necessarily using the word 'liquefaction,' [they] provided sufficient clarity such that DEQ understood the issue and used its expertise to resolve the claim, explicitly addressing liquefaction in its responses." *Mont. Trout Unlimited*, ¶ 22.

¶27 *Montana Trout Unlimited* relied on *Vote Solar*, which stated that "so long as a claimant provides enough clarity such that the decision maker understands the issues raised for the agency to use its expertise to resolve the claim, the claimant will have met this burden." *Vote Solar v. Mont. Dept. of Public Serv. Regul.*, 2020 MT 213A, ¶ 48, 402 Mont. 85, 473 P.3d 963. In *Vote Solar*, plaintiffs raised an issue on a motion for reconsideration of an order before the Montana Public Service Commission. *Vote Solar*, ¶¶ 27, 49. Because plaintiffs advanced "fundamentally the same argument" in the courts as they did with the administrative agency, we held that they raised the issue with sufficient clarity to exhaust administrative remedies. *Vote Solar*, ¶ 50. General issue exhaustion principles support this reasoning. *See Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) (citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002))

14

("[A]lerting the agency in general terms will be enough if the agency has been given 'a chance to bring its expertise to bear to resolve [the] claim."); 4 Richard Murphy & Charles H. Koch, *Administrative Law and Practice*, § 12:22, 259 (3d ed. Supp. 2024) ("[A]lthough an agency's consideration of an issue will not cure a party's failure to raise an issue where the requirement of issue exhaustion is jurisdictional, the agency's consideration of the issue may provide strong evidence that the party did, in fact, provide sufficient notice to the agency to satisfy issue exhaustion.").

¶28　MEIC argues that it satisfied exhaustion requirements because its comment on "impacts related to increased industrialization" in the area implicitly included a concern about industrial lighting. Relying on *Vote Solar*, MEIC contends that DEQ understood the issue raised. It points out that although the original EA did not include any references to lighting, the second EA mentions lighting specifically, and DEQ's responses to MEIC's comments also point MEIC to lighting. NorthWestern contends the vague references are not sufficiently specific to present the issue to DEQ in the first instance. DEQ makes no argument on this point.

¶29　MEIC's comment on the Draft EA—"impacts related to industrialization"—is a general, conclusory comment at the end of a list. Though it could be questioned whether this single comment provided sufficient clarity on the concern about the facility's lighting, the administrative record reveals that DEQ likely understood it as such. The Draft EA did not include any mention of lighting. Then, in response to MEIC's comments about the increased impacts of industrialization, DEQ directed MEIC to the aesthetics section in the final EA, which specifically mentioned lighting for the first time. Like in *Vote Solar* and

15

*Montana Trout Unlimited*, DEQ's response indicates that it understood the issue and resolved the claim.

¶30 Most importantly in this case, DEQ does not defend this issue on appeal. DEQ began another lighting analysis after the District Court vacated the permit but discontinued it when the District Court stayed the vacatur. In *Park County Environmental Council*, this Court held that DEQ's analysis on the impact of expected road improvements on wildlife in the area was arbitrary and capricious. *Park Cnty. Env't Council*, ¶ 36. DEQ did not defend its analysis on the road work impacts on appeal and asked the Court to remand to DEQ to conduct supplemental environmental review on the issue. *Park Cnty. Env't Council*, ¶ 36. Although the mining company defended DEQ's initial analysis, this Court reasoned that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Park Cnty. Env't Council*, ¶ 36 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S. Ct. 2856, 2870 (1983)). Thus, on these specific facts and because DEQ does not defend its lighting analysis, we find the issue minimally preserved.

¶31 Examining the analysis, we apply the same narrow standard of review as in our consideration of DEQ's analysis of noise impacts: we afford the agency great deference, we do not substitute our own judgment, and we focus on the decision-making process itself, not the outcome. *Mont. Trout Unlimited*, ¶ 12. We do, however, review the record to determine whether the agency considered relevant data and articulated a reasoned decision. *Mont. Trout Unlimited*, ¶ 93.

¶32    In *Ravalli County Fish & Game Association, Inc.*, for example, this Court held that the agency did not take a hard look when it failed to consider the impacts of disease transmission from grazing domesticated sheep in known bighorn sheep territory. *Ravalli Cnty. Fish & Game Ass'n, Inc. v. Mont. Dep't of State Lands*, 273 Mont. 371, 381, 903 P.2d 1362, 1369 (1995). This Court reasoned that without a proper record, courts are left to speculate on the basis for agency decisions, which runs contrary to MEPA purposes. *Ravalli Cnty.*, 273 Mont. at 382, 903 P.2d at 1369.

¶33    In *Clark Fork Coalition*, this Court concluded that the agency failed to take a hard look at the impacts from polluted water discharge after a mine closed. *Clark Fork Coal.*, ¶ 48. Noting that "an agency must supply a statement of reasons why potential impacts of a proposed action . . . are nonsignificant," we determined that the agency failed to take a hard look at what would be required to maintain the river's water quality after the mine's closure or look at other sufficient remedial measures before deciding to issue a permit on the basis that discharge would be nonsignificant. *Clark Fork Coal.*, ¶ 48.

¶34    In contrast, in *Montana Wildlife Federation*, we affirmed the District Court's conclusion that an agency took a "hard look" under MEPA because the EA pointed to specific sources of major environmental studies, described the agency's analysis method, and rationally explained its steps and facts relied upon to reach a conclusion. *Mont. Wildlife Fed'n*, ¶ 51. The determination was further supported by the agency's "extensive information base," including "hundreds of pages of documentation of the Board's analysis of gas well drilling in the area in question over many years." *Mont. Wildlife Fed'n*, ¶ 51.

¶35 In *Park County Environmental Council*, this Court also analyzed whether DEQ took a hard look at water quality issues. *Park Cnty. Env't Council*, ¶ 37. We reasoned that "[t]he process of assigning relative weights for predictive purposes is essentially a technical exercise requiring agency expertise that should be afforded substantial deference . . . and the District Court erred in substituting its judgment for that of the agency regarding which samples were most predictive of the environmental impacts." *Park Cnty. Env't Council*, ¶ 43. Thus, DEQ "articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made," and its decision was not "arbitrary, capricious, unlawful, or [un]supported by substantial evidence." *Park Cnty. Env't Council*, ¶ 41 (quoting *Mont. Env't Info. Ctr. v. Mont. Dep't of Env't Quality*, 2016 MT 9, ¶ 14, 382 Mont. 102, 365 P.3d 454; *Clark Fork Coal.*, ¶ 47).

¶36 *Hillcrest* dealt with DEQ issuance of a solid waste management system license to the City of Billings for future expansion of its regional landfill. *Hillcrest Nat. Area Found., Inc. v. Mont. Dep't of Env't Quality*, 2022 MT 240, ¶ 1, 411 Mont. 30, 521 P.3d 766. This Court held that DEQ took the requisite hard look in its EA. *Hillcrest*, ¶ 44. DEQ looked at the topography of the site, found that the landfill would fill a coulee (thus limiting visual impacts in extent and duration), reasoned that tree and brush planting measures would provide further mitigation, and concluded that over time the landfill would appear as low hills that blend into existing natural surrounding landscapes. *Hillcrest*, ¶ 42.

¶37 Here, in contrast, and unlike DEQ's analysis of noise impacts, the Final EA made just one statement in considering the facility's lighting impacts: "Since the facility would operate 24/7 365 days per year, some external lighting would exist at the facility and may

18

be visible from the immediate surrounding properties." DEQ asserted at the trial court that since it is "already a heavy industrial landscape . . . residents already have views of numerous stacks from the existing facilities, and the addition of neighboring stacks to the skyline will not change the overall aesthetics of the area." The District Court ruled that the single comment on lighting revealed no analysis of how bright the added lights would be or any other analysis, and that simply comparing the facility to the Laurel refinery "tells the people of Montana nothing about this project and its external emissions of lights." DEQ does not challenge that conclusion or defend its lighting analysis on appeal.

¶38 NorthWestern challenges the District Court's lighting decision and argues that our holding in *Belk v. Montana Department of Environmental Quality*, 2022 MT 38, 408 Mont. 1, 504 P.3d 1090, is dispositive. NorthWestern contends that, like in *Belk*, DEQ analyzed "(1) the distance between the plant's lighting and receptors (at least 1,030 feet), (2) the severity of the lighting, or how the distance would affect impacts (some lighting 'may be visible'), (3) the geographic scope of the lighting (potentially visible to 'immediate surrounding properties'), and (4) the frequency or duration of the lighting (lights potentially in operation '24/7 365 days per year')." NorthWestern further argues that there is no specific requirement under MEPA that the agency evaluate the type of lights or brightness, as mentioned in the District Court order.

¶39 In *Belk*, a quarry applied for an operating permit under Montana's Metal Mine Reclamation Act (MMRA), and DEQ prepared an EA. *Belk*, ¶ 6. DEQ's analysis included measurements to explain why the visual disturbance would not dominate the landscape. *Belk*, ¶ 27. In finding MEPA requirements satisfied, this Court held that plaintiffs could

19

not point to any authority requiring that an environmental review specifically assess impacts in "quantitative economic terms." *Belk*, ¶ 29. In determining whether to require a full environmental impact statement, DEQ must consider "the severity, duration, geographic extent, and frequency" of impacts. *Belk*, ¶ 31 (citing Admin. R. M. 17.4.608(1)(a) [1989]). Here, though—unlike its noise analysis and as required by *Belk*—DEQ did not list the relevant information considered, any analysis of the information, or what data it relied on in coming to a conclusion. *Belk*, ¶ 26.

¶40 The cases agreeing that the agency took a "hard look" consistently found at least some sort of data, process, or analysis by which the agency arrived at its conclusion. *E.g., Belk*, ¶ 26; *Hillcrest*, ¶ 42. It is unclear here how DEQ arrived at the conclusion for lighting. The analysis consists of one conclusory and generalized statement about the existence of some risk, which we disapproved in *Montana Wildlife Federation*. *Mont. Wildlife Fed'n*, ¶ 43 ("[G]eneral statements about possible effects and the existence of some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." (citations and internal quotations omitted)).

¶41 Our review of agency decisions is narrow, but we "will not automatically defer to the agency without carefully reviewing the record" to ensure that the agency has made a reasoned decision. *MEIC 2019*, ¶ 26 (quoting *Clark Fork Coal.*, ¶ 21) (internal quotations omitted). NorthWestern is correct that nothing in MEPA or the administrative rules requires DEQ to evaluate specific types of light or their brightness. *See e.g. Belk*, ¶ 29 (noting no MEPA requirement for specifying "quantitative economic terms" while assessing impacts on recreation economy and property values). The District Court did not,

however, require that level of specificity but relied on the complete lack of analysis on this subject. This Court is not substituting its judgment for the conclusion reached but requiring the agency to examine relevant information and explain a rational connection between the facts found and the choice made. *MEIC 2019*, ¶ 26 (citing *Clark Fork Coal.*, ¶ 47). Without any such explanation here, and no argument on the point from the agency, we affirm the District Court's holding that DEQ's lighting analysis was arbitrary and capricious.

¶42 *3. Did the District Court err in concluding that MEPA requires DEQ to analyze greenhouse gas emissions as part of its air quality permitting process?*

¶43 In response to DEQ's Draft EA, many public comments expressed specific concerns about the plant's GHG emissions. DEQ responded to these concerns in the final EA, stating that this permit application did not require DEQ to evaluate GHGs; the Air Quality Bureau at DEQ "does not regulate GHGs such as $CO_2$"; and, until "the State of Montana decides to regulate [GHGs] as part of the Air Quality Bureau's statutory requirements, $CO_2$ emissions are only required to be reported by certain industrial sources under Federal Reporting Programs . . . when proposed emissions are above very high thresholds[.]" Further, DEQ responded (to both public comments and the MEIC letter) that because the LGS "does not trigger PSD [prevention of significant deterioration] permitting as a new major source of emissions, . . . no BACT [best available control technology] analysis is required for GHGs on this application."[4]

---

[4] "PSD" stands for Prevention of Significant Deterioration, a federal standard that applies to new major sources or major modifications at existing sources for pollutants in certain areas. *See Prevention of Significant Deterioration Basic Information*, EPA (last updated Jan. 17, 2024),

¶44    The District Court observed that the final EA stated the LGS "would be identified as a power plant by EPA, and would be required to report under the Acid Rain Program and also to the EPA Greenhouse Gas Reporting Program," but the EA did not otherwise analyze LGS's GHG emissions. Applying § 75-1-201(2)(a), MCA (2021) (the statute in effect at the time the District Court issued its order), the District Court concluded that DEQ must take a hard look at GHG effects within Montana's borders. The court reasoned that the plain language of § 75-1-201(2)(a), MCA, "precludes agency MEPA review of environmental impacts that are 'beyond Montana's borders,' but it does not absolve DEQ of its MEPA obligation to evaluate a project's environmental impacts within Montana."

¶45    We first address NorthWestern's mootness argument. On May 10, 2023, the Governor signed HB 971, which amended § 75-1-201(2)(a), MCA, to state that an environmental review may not "include an evaluation of greenhouse gas emissions" within the state borders or beyond the state borders (subject to narrow exceptions). 2023 Mont. Laws ch. 450, § 1. NorthWestern contends that this 2023 amendment renders moot any argument that DEQ must analyze GHG emissions. The 2023 amendments, however, are not retroactive. Section 1-2-109, MCA, states that "[n]o law contained in any of the statutes of Montana is retroactive unless expressly so declared." HB 971 contains no retroactivity clause. *See* 2023 Mont. Laws ch. 450. Neither NorthWestern nor DEQ argues that the 2023 amendments are retroactive. The District Court properly applied the 2021 MEPA statute in reviewing DEQ's air quality permit. HB 971 did not moot MEIC's

https://www.epa.gov/nsr/prevention-significant-deterioration-basic-information [https://perma.cc/DAZ8-HFZQ].

22

argument, and we apply the 2021 version of § 75-1-201(2)(a), MCA, in determining whether DEQ must analyze GHG emissions.

¶46 Section 75-1-201(2)(a), MCA (2021), requires that, subject to certain exceptions, an environmental review "may not include a review of actual or potential impacts beyond Montana's borders. It may not include actual or potential impacts that are regional, national or global in nature." The District Court concluded that despite precluding MEPA review of impacts "beyond Montana's borders," the statute required DEQ nonetheless to analyze impacts of GHGs within Montana. Courts interpret statutes first by looking at the "plain meaning of the words." *State v. Kelm*, 2013 MT 115, ¶ 22, 370 Mont. 61, 300 P.3d 687 (citation omitted). The statute plainly says that MEPA environmental reviews cannot examine impacts beyond Montana's borders, subject to certain exceptions. The District Court observed—and DEQ does not disagree—that the agency "did not take any sort of look at the impacts" of the LGS's GHG emissions within Montana. An environmental review under MEPA must, among other things, identify "any adverse effects on Montana's environment that cannot be avoided if the proposal is implemented." Section 75-1-201(1)(b)(iv)(B), MCA. One purpose of an EA is "to avert potential environmental harms through informed decision making." *Park Cnty. Env't Council*, ¶ 76. As we have observed, "MEPA's procedural mechanisms help bring the Montana Constitution's lofty goals into reality by enabling fully informed and considered decision making, thereby minimizing the risk of irreversible mistakes depriving Montanans of a clean and healthful environment." *Park Cnty. Env't Council*, ¶ 70.

¶47 That the GHG emissions of the Laurel facility may reach far outside Montana does not allow the agency to completely ignore whether and to what extent they may result in adverse effects on Montana's environment. *See Held*, ¶ 66. The State does not have "a free pass to pollute the Montana environment just because the rest of the world insist[s] on doing so." *Held*, ¶ 30. DEQ did not dispute that the LGS would produce $CO_2e$ emissions equal to the annual emissions of more than 167,000 passenger vehicles, and it acknowledged that "Montana's fossil fuel Electric Generating Units (EGUs) are the largest contributor of greenhouse gases in Montana." In comments to the agency, MEIC argued that even though Montana has not adopted significance thresholds for GHGs, DEQ could not simply omit a BACT analysis for a significant pollutant. MEIC suggested that limitations "could be achieved through more efficient generators, heat rate limits, or operational restrictions, among other things." DEQ responded that under current standards and interpretations of the federal Clean Air Act, the LGS "does not trigger PSD permitting as a new major source of emissions" and, as such, a BACT analysis was not required. As explained below, the absence of substantive permitting standards for GHGs may affect the agency's ability to disapprove a permit, but it does not alter MEPA's procedural requirements for the "adequate review of state actions in order to ensure that: (a) environmental attributes are fully considered by the legislature in enacting laws to fulfill constitutional obligations; and (b) the public is informed of the anticipated impacts in Montana of potential state actions." Section 75-1-102(1), MCA. *See also* Admin. R. M. 17.4.609(3)(d), (e) (1989) (requiring an environmental assessment to contain "an evaluation of the impacts, including cumulative and secondary impacts, on the

24

physical environment" and on the "human population in the area to be affected by the proposed action").

¶48 NorthWestern maintains, however, that our holding in *Bitterrooters for Planning, Inc. v. Montana Department of Environmental Quality*, 2017 MT 222, 388 Mont. 453, 401 P.3d 712, precludes DEQ's obligation to analyze GHGs. *Bitterrooters* dealt with a DEQ wastewater discharge permit under the Montana Water Quality Act (MWQA) for a wastewater treatment facility treating discharge from a retail store. *Bitterrooters*, ¶ 1. The district court held that DEQ failed to consider the broader impacts of the retail facility (such as air and soil pollution, traffic increases, traffic safety, and potential impacts on nearby residential property values), which the court found to be secondary impacts of the issuance of the wastewater discharge permit. *Bitterrooters*, ¶¶ 11, 14, 24. Because the facility would not be able to operate "but for" the issuance of the wastewater discharge permit to the treatment facility, the district court determined that DEQ failed to comply with MEPA. *Bitterrooters*, ¶ 24. This Court rejected "the unyielding 'but for' causation." *Bitterrooters*, ¶ 33. We reasoned that "the broader environmental impacts of the larger construction and operation of the retail store are not subject to MEPA review because the Legislature has not placed general land use control in the hands of a state agency." *Bitterrooters*, ¶ 34. Instead, as we had recognized in *Montana Wilderness Association v. Montana Board of Health & Environmental Sciences*, 171 Mont. 477, 485-86, 559 P.2d 1157, 1161 (1976), "the Legislature has, with limited exceptions, placed general land use control beyond the reach of MEPA in the hands of local governments." *Bitterrooters*, ¶ 34. *Bitterrooters* held that an agency must analyze effects under MEPA whenever there is "a reasonably close

25

causal relationship between the *triggering state action* and the subject environmental effect." *Bitterrooters*, ¶ 33 (emphasis added). We made clear that our holding does "not gut MEPA" and "still requires state agencies to adequately consider, 'to the fullest extent possible' within the scope of their independent authority, all direct and secondary environmental impacts that will likely result from the specific activity conducted or permitted by the agency." *Bitterrooters*, ¶ 34; *see also Held*, ¶¶ 61-64.

¶49 NorthWestern contends that, similar to the *Bitterrooters* analysis, there is no substantive authority under the Montana Clean Air Act or federal standards through which DEQ could deny the permit under a MEPA review of GHG emissions, and thus DEQ cannot lawfully prevent the plant's GHG emissions, nor is it required to perform a MEPA review of GHG emission impacts. Further, NorthWestern argues that the Montana Legislature has not provided DEQ the authority to regulate GHGs, making *Bitterrooters* even more applicable. MEIC counters that DEQ must analyze GHG emissions as part of its MEPA review for an air quality permit. MEIC contends that GHG emissions are within the ambit of air quality over which DEQ has regulatory authority, thus satisfying the causal relationship required in *Bitterrooters*. Additionally, MEIC asserts that the Clean Air Act of Montana authorizes DEQ to establish emission limits, and this further puts GHG emission analysis within DEQ's regulatory authority.

¶50 In *Bitterrooters* and the cases on which it relied, the plaintiffs sought to compel the agency to evaluate impacts of actions that were vested in a separate governmental authority and outside the agency's authority over the narrower, permitted action. *Bitterrooters*, ¶ 13; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769-70, 124 S. Ct. 2204, 2216-17 (2004)

26

(Federal Motor Carrier Safety Administration not required to review environmental impacts from increase in Mexican trucks within the United States, as the increase would not result from agency regulations and increased roadside inspections but from President's plan to lift moratorium on Mexican motor carriers operating within the United States); *Montana Wilderness Ass'n*, 171 Mont. at 484-85, 559 P.2d at 1161 (State environmental agency not required to consider impacts of proposed 95-acre subdivision beyond the scope of its authority over water supply, sewage, and solid waste disposal regulations). MEPA, we reasoned, constrains the agency to examine the direct, secondary, and cumulative impacts that will result from the *permitted* action, which in *Bitterrooters* was only the wastewater treatment facility, separate from the larger facility. *Bitterrooters*, ¶¶ 24-25.

¶51 Here, the triggering state action is the air quality permit for the LGS. DEQ appropriately analyzed numerous impacts in the Final EA, including noise emissions from the plant and the effects of industrialization (which, as noted, includes lighting impacts). The District Court properly applied *Bitterrooters* when it concluded that DEQ did not need to analyze in the air quality review the potential impacts of the plant's riverbed pipeline. As the court observed, "the State Land Board . . . has authority for issuing easements and other rights-of-way over state land, including pipeline permitting for riverbed crossing[.]" The court observed that the State Land Board had "conducted a MEPA review of an easement for the pipeline to cross under the Yellowstone River and issued the easement." The District Court reasoned correctly that MEPA analysis should be "confined to the environmental impacts of the proposed actions and not to the impacts of the larger projects."

27

¶52 Because MEPA governs procedure, it does not provide "for regulatory authority, beyond authority explicitly provided for in an existing statute, to a state agency." Section 75-1-102(3)(b), MCA. MEPA provides the procedure that DEQ must follow in issuing an air quality permit; the Clean Air Act of Montana under Title 75, Chapter 2, MCA, provides the substantive authority under which a permit may be granted or denied. MEPA "must be construed in harmony with the substantive limitations of an agency's applicable regulatory authority." *Bitterrooters*, ¶ 30.

¶53 The Legislature granted broad authority to DEQ under Montana's Clean Air Act for air pollution control because it "defies the establishment of precise standards[,] involves a highly specialized science [which] covers a broad spectrum[, and] . . . is not reducible to easy equations due" to our growing understanding of the environment and its impact on our lives. *State ex rel. Dept. of Health and Env't. Sciences v. Lincoln Cnty.*, 178 Mont. 410, 415, 584 P.2d 1293, 1296 (1978) (overruled on other grounds by *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, ¶ 46, 315 Mont. 210, 69 P.3d 663). Section 75-2-103(2), MCA, of Montana's Clean Air Act defines air pollutants as "one or more air contaminants that are present in the outdoor atmosphere, including those pollutants regulated pursuant to" the federal Clean Air Act. The definition "includ[es]" those pollutants regulated pursuant to the federal Clean Air Act, but the Montana Act does not limit the State's consideration to federally regulated pollutants. Under § 75-2-203(1), MCA, DEQ sets emissions levels and "may establish the limitations of the levels, concentrations, or quantities of emissions of *various pollutants from any source necessary to prevent, abate or control air pollution*." (Emphasis added.) "[T]he department may fix more stringent requirements governing the

28

emission of air pollutants," and "[s]hould federal minimum standards of air pollution be set by federal law, the department may . . . set more stringent standards by rule." Sections 75-2-203(2), (4), MCA. *See also* Admin. R. M. 17.8.749(5) (2016) (providing for "state-only" conditions in an air quality permit). Montana's Clean Air Act requires DEQ to "prepare and develop a comprehensive plan for the prevention, abatement, and control of air pollution" in Montana. Section 75-2-112(3)(c), MCA. Section 75-2-211, MCA, grants DEQ authority to establish rules governing air quality permits under the Montana Clean Air Act. Thus, Montana's Clean Air Act allows DEQ broad authority to regulate air pollutants, which includes GHGs.

¶54 The Administrative Rules of Montana Title 17, Chapter 8 implement the statutory mandates of the Montana Clean Air Act. Currently, DEQ does not have ambient air quality standards in place for GHG emissions. *See* Admin. R. M. 17.8, Subchapter 2.

¶55 Unlike in *Bitterrooters*, however, the regulation of air pollutants falls squarely within DEQ's authority under § 75-2-203, MCA, of the Clean Air Act of Montana. GHGs are an air pollutant that affect air quality, and thus evaluating the impacts of GHG emissions from the LGS comes within the ambit of a permit evaluating air quality impacts. *See Held*, ¶ 64 ("the State's argument that GHG emissions do not have a 'reasonably close causal relationship' to permitting . . . an electrical generation plant . . . is disingenuous at best.").

¶56 Notably though, and likely because there is no current ambient air quality standard established for GHG emissions, MEIC did not bring a Clean Air Act challenge. Section 75-1-201(4)(a), MCA, clarifies that an "agency may not withhold, deny, or impose conditions on any permit or other authority to act based on" MEPA alone. MEPA does,

however, allow a project sponsor and the regulating agency to mutually develop measures that are incorporated into the permit or other authority to act. Section 75-1-201(4)(b), MCA. And a violation of MEPA procedures permits a plaintiff to seek equitable relief, as discussed further below. Section 75-1-201(6)(c), MCA; *see also Park Cnty.*, ¶ 89.

¶57 MEPA thus provides a review process for an agency's permitting considerations; it is not a regulatory enforcement law. MEPA expresses the Legislature's intent that state agencies fully consider all aspects of a proposal and ensure that "the public is informed of the anticipated impacts in Montana of potential state actions." Section 75-1-102(1)(a), (b), MCA; *see also* Mont. Const., art. II, § 8; § 2-3-103, MCA (providing for public participation). We did not hold in *Held*, and do not hold here, that DEQ is required to analyze GHG emissions for every potential state action. *See Held*, ¶ 68 (declaring unconstitutional a law that *prohibited consideration in all cases* of GHG emissions). Nor do we hold that DEQ must regulate GHG emissions in an air quality permit application. Again, MEIC does not assert Clean Air Act violations. Plaintiffs brought their challenge under MEPA. And in a case like this one, which undisputedly involves a significant amount of $CO_2e$ emissions (nearly 770,000 tons annually) from a fossil fuel Electric Generating Unit and generated hundreds of public concerns regarding potential impacts from those emissions, MEPA requires DEQ to analyze the direct, secondary, and cumulative impacts of this permitted action.

¶58 Although DEQ has the statutory authority to regulate GHGs, MEIC and NorthWestern differ on whether DEQ could *deny* an air quality permit without any sort of substantive authority in place that sets GHG limits under the Clean Air Act or

30

administrative rules.[5]  There is a difference, however, between what DEQ is required to do under the Clean Air Act to grant or deny an air quality permit, and what it is required to do within the scope of its authority under MEPA.  NorthWestern argues that DEQ's lack of substantive authority to regulate GHG emissions justified its failure to analyze GHG emissions in the MEPA review.  NorthWestern incorrectly conflates DEQ's authority to grant or deny a permit with its obligation to conduct adequate MEPA analysis.

¶59    Here, the claim is that DEQ failed to follow MEPA procedural requirements before it issued the air quality permit.  As discussed above, MEPA does not confer regulatory authority beyond what is explicitly provided for in an existing statute.  Opinion, ¶¶ 52, 56. We require only that DEQ follow its MEPA obligations to conduct an adequate analysis in an environmental assessment or environmental impact statement—which in this case, includes evaluating GHGs in its analysis of the LGS air quality permit.

¶60    The argument that the plant's current levels would not trigger a BACT analysis or other federal regulations under *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 134 S. Ct. 2427 (2014), does not excuse DEQ's obligation to at least evaluate the impacts through an environmental review.  MEPA's purpose is "to promote efforts that will prevent, mitigate, or eliminate damage to the environment and biosphere and stimulate the health and welfare of humans[.]"  Section 75-1-102(2), MCA.  The absence of federal standards for GHGs does not affect DEQ's requirement to conduct an adequate MEPA analysis that comports with MEPA's unique role in protecting Montanans' constitutional

---

[5] DEQ, again, is silent on this point.

right to a clean and healthful environment. *Held*, ¶ 60. Federal standards tell the people of Montana little or nothing about any potential impact of the GHG emissions of the LGS specifically, and do not satisfy "MEPA's role" in fulfilling "the strongest environmental protection provision found in any state constitution." *Park Cnty. Env't Council*, ¶¶ 61, 65 (citing *Mont. Env't Info. Ctr. v. Mont. Dep't Env't Quality*, 1999 MT 248, ¶ 66, 296 Mont. 207, 988 P.2d 1236). An environmental review "assist[s] the legislature in determining whether laws are adequate to address impacts to Montana's environment and . . . inform[s] the public and public officials of potential impacts resulting from decisions made by state agencies." Section 75-1-102(3)(a), MCA. *See also* Admin. R. M. 17.4.609(3)(d), (e) (1989) (requiring an environmental assessment to contain "an evaluation of the impacts, including cumulative and secondary impacts, on the physical environment" and on the "human population in the area to be affected by the proposed action"). MEPA's statutory goal is to promote efforts that prevent or eliminate environmental damage. *Ravalli Cnty.*, 273 Mont. at 379, 903 P.2d at 1368. "MEPA serves a role in enabling the Legislature to fulfill its constitutional obligation to prevent environmental harms infringing upon Montana's right to a clean and healthful environment." *Park Cnty. Env't Council*, ¶ 67. "MEPA requires DEQ to engage in a prescribed level of environmental forecasting before taking an action impacting the environment," and is essential to the "State's efforts to meet its constitutional obligations." *Park Cnty. Env't Council*, ¶¶ 31, 89; *see also Held*, ¶¶ 59-60.

¶61 The question of GHG emissions is brought to this Court on a MEPA challenge after an overwhelming number of the 700 public comments—as lawfully allowed in the

administrative process—expressed concern about the plant's GHG emissions. Whatever the status of regulatory GHG standards, or lack thereof, the additional information serves a purpose. The public requested this information, and it was appropriate information to include in DEQ's MEPA analysis as a direct and secondary impact stemming from the LGS. *See Held*, ¶ 64. Under established law evaluating whether DEQ satisfied MEPA requirements, the District Court found the agency's decision not to analyze GHGs arbitrary and capricious because DEQ "failed to evaluate the plant's [GHG] emissions and corresponding impacts of the climate in Montana." We affirm this reasoning. *Belk* requires the agency "make a reasoned decision after carrying out its MEPA responsibilities in full" which includes "the obligation to make an adequate compilation of relevant information, to analyze it reasonably, and to consider all pertinent data." *Belk*, ¶ 26. The agency did not do this analysis, and instead stated only that GHG "emissions are not required to be evaluated for this permit application." Our affirming the District Court's conclusion that this is arbitrary and capricious aligns with case precedent evaluating whether MEPA obligations are satisfied.

¶62 Finally, despite the fact that the plant has been built, an adequate MEPA evaluation of GHG emissions for the LGS is not moot. MEPA's purpose is to inform not just public officials, but also the *public* of project impacts within their communities. Section 75-1-102(3)(a), MCA. Administrative processes contemplate public participation, *see* § 2-3-103, MCA, and DEQ must consider the substantive comments received in response to an EA. *See* Admin. R. M. 17.4.610(6) (1989). No party to the case has argued that further MEPA review is mooted by this development or that DEQ's obligation to

33

inform the public through adequate MEPA analysis no longer exists because a project continues to move forward. We agree. MEPA contemplates the continuation of a project even when an agency's review is determined to be insufficient. Section 75-1-201(6)(c)(ii)(C), MCA. It also, as noted above, allows the agency and the project sponsor mutually to develop measures that may be incorporated into a permit. Section 75-1-201(4)(b), MCA. Given the nature of the facility here and DEQ's acknowledgment of the emissions it will produce, MEPA does not permit the agency to forego an adequate inquiry, analyzing the extent to which, if any—though the agency lacks a regulatory-standard basis for denial—this project has environmental impact of some significance, and so informing the public. Within the limits of *Bitterrooters*, and on the record discussed above, DEQ is obligated to identify impacts and acknowledge their significance even if there is no regulatory enforcement mechanism. We affirm the District Court's holding that MEPA required DEQ to consider the impact of GHG emissions within Montana in its evaluation of an air quality permit for the LGS.

¶63   *4. Did the District Court err in vacating the permitting decision without making specific findings under § 75-1-201(6)(c)(ii), MCA?*

¶64   Relying on *Park County Environmental Council¸* the District Court vacated the permit. It did not apply the "equitable relief requirements" of § 75-1-201(6)(c)(ii), MCA, or make any of the specific findings the statute requires. NorthWestern and DEQ contend that this was in error as a matter of law, and the District Court's vacatur must be reversed.

¶65   After the District Court vacated the permit, we decided *Water for Flathead's Future*. Considering this decision, the District Court stayed its decision to vacate the permit.

34

Following the District Court's stay of its decision to vacate the permit, Northwestern fully completed its construction of the LGS.[6] MEIC did not seek relief from the District Court's stay of its vacatur. *See* M. R. App. P. 22(2).

¶66   Section 75-1-201(6)(c), MCA, provides exclusive remedies for a challenge to the adequacy of an environmental review under MEPA. Section 75-1-201(6)(c)(i), MCA; *see also Water for Flathead's Future*, ¶ 35. Section 75-1-201(6)(c)(ii), MCA, provides that a court considering "a request for a temporary restraining order, preliminary injunction, permanent injunction, *or other equitable relief* may not enjoin the issuance or effectiveness of a license or permit or part of a license or permit issued pursuant to Title 75 or Title 82 unless the court specifically finds" that the challenging party is likely to prevail on the merits of its claim and that "in the absence of a temporary restraining order, a preliminary injunction, a permanent injunction, or *other equitable relief*":

> (A) [the] party requesting the relief will suffer irreparable harm in the absence of the relief;
> (B) issuance of the relief is in the public interest. In determining whether the grant of the relief is in the public interest, a court:
>   (I) may not consider the legal nature or character of any party; and
>   (II) shall consider the implications of the relief on the local and state economy and make written findings with respect to both.
> (C) relief is as narrowly tailored as the facts allow to address both the alleged noncompliance and the irreparable harm the party asking for the relief will suffer. In tailoring the relief, the court shall ensure, to the extent possible, that the project or as much of the project as possible can go forward while also providing the relief to which the applicant has been determined to be entitled.

---

[6] Amy Nile, *NorthWestern fires up gas plant near Laurel, fueling neighbors fight for open public process*, Billings Gazette (July 17, 2024), https://billingsgazette.com/news/local/government-politics/yellowstone-generation-station-now-producing-power-near-laurel/article_771fcc6e-42af-11ef-9781-47ac587031e5.html [https://perma.cc/U6HY-CEJR]

Section 75-1-201(6)(c)(ii), MCA (emphasis added).

¶67     In *Park County Environmental Council*, this Court affirmed a district court's vacatur of a mining permit due to various MEPA violations. *Park Cnty. Env't Council*, ¶ 90. This Court further invalidated as unconstitutional a 2011 MEPA amendment that stated a court's *only* remedy for MEPA violations was "to remand to the agency to complete its review, with no ability to halt the project in the interim." *Park Cnty. Env't Council*, ¶¶ 57, 89. The Court held that "MEPA is an essential aspect of the State's efforts to meet its constitutional obligations, as are the equitable remedies without which MEPA is rendered meaningless." *Park Cnty. Env't Council*, ¶ 89. Thus, "equitable relief must play a role in the constitutional directive to ensure [adequate remedies] to prevent the potential degradation that could infringe upon the environmental rights of present and future generations." *Park Cnty. Env't Council*, ¶ 64. "[A] remedy implemented only *after* a violation is a hollow vindication of constitutional rights if a potentially irreversible harm has already occurred." *Park Cnty. Env't Council*, ¶ 76 (citing Montana Constitutional Convention, Verbatim Transcript, March 1, 1972, Vol. V, p. 1230). "Without a mechanism to prevent a project from going forward until a MEPA violation has been addressed, MEPA's role in meeting the State's anticipatory and preventative constitutional obligations is negated." *Park Cnty. Env't Council*, ¶ 72 (internal quotations omitted).

¶68     When *Park County Environmental Council* invalidated the 2011 MEPA remedy provisions prohibiting equitable relief, it made effective a contingency section enacting the statutory language at issue here. 2011 Mont. Laws ch. 396, §§ 7, 9, 11 (SB 233).

¶69   In *Water for Flathead's Future*, this Court held that a district court erred when it applied the § 75-1-201(6)(c)(ii), MCA, provisions, found vacatur improper after applying those provisions, but nonetheless granted vacatur under its "inherent authority" in reliance on *Park County Environmental Council*. *Water for Flathead's Future*, ¶ 35. This Court reasoned that the current remedy provisions of § 75-1-201(6)(c), MCA, were not effective at the time of our decision in *Park County Environmental Council*, and the district court "erred by departing from its framework" and granting vacatur because the statutory framework provided the exclusive remedies for successful challenges to an agency decision. *Water for Flathead's Future*, ¶ 36.

¶70   MEIC contends that *Water for Flathead's Future* is distinguishable and not binding on this case. It maintains that the definition of the word *enjoin* makes the requirements under § 75-1-201(6)(c)(ii), MCA, applicable to injunctive relief only, not to vacatur. This Court cannot "omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA. If "there is doubt about the meaning of a phrase in a statute, the statute is to be construed in its entirety and the phrase must be given a reasonable construction which will enable it to be harmonized with the entire statute." *McClanathan v. Smith*, 186 Mont. 56, 61, 606 P.2d 507, 510 (1980). "When construing a challenged statute, the Court will read and interpret the statute as a whole, without isolating specific terms from the context in which they are used by the Legislature." *City of Great Falls v. Morris*, 2006 MT 93, ¶ 19, 332 Mont. 85, 134 P.3d 692.

¶71   The statute requires that when a court is considering a request for a temporary restraining order, preliminary injunction, permanent injunction, or *other equitable relief* for an alleged MEPA violation, the court cannot "enjoin the issuance or effectiveness of a license or permit or part of a license or permit" unless it makes specific findings. Section 75-1-201(6)(c)(ii), MCA (emphasis added).  Vacatur is a form of equitable relief. *Park Cnty. Env't Council*, ¶ 89.

¶72   "We are required to avoid any statutory interpretation that renders any sections of the statute superfluous and does not give effect to all of the words used."  *State v. Heath*, 2004 MT 126, ¶ 31, 321 Mont. 280, 90 P.3d 426 (citation omitted).  This Court rejects a statutory construction "that would leave any part of the statute without effect."  *Spoklie v. Mont. Dep't of Fish, Wildlife & Parks*, 2002 MT 228, ¶ 24, 311 Mont. 427, 56 P.3d 349. If this Court reads "enjoin" as applying only to injunctions, it will render meaningless the phrase "other equitable relief," which appears twice within that subsection of the statute as an additional form of relief to which its provisions extend.

¶73   In subsection 6(d), immediately following subsection 6(c), the statute says that "[t]he court may issue a temporary restraining order, preliminary injunction, permanent injunction, *or other injunctive relief*," if certain additional requirements apply. Section 75-1-201(6)(d), MCA, (emphasis added).   This highlights the Legislature's awareness and intent to differentiate which sections under § 75-1-201(6)(c), MCA, apply

38

to all equitable relief (including vacatur) and which apply to only injunctive relief.[7] *Dep't of Revenue v. Burlington Northern Inc.*, 169 Mont. 202, 211, 545 P.2d 1083, 1088 (1976) (This Court "must presume the [L]egislature knew what it was doing" when enacting a statute.).

¶74    Our holdings in *Water for Flathead's Future* and *Protect the Clearwater* confirm that § 75-1-201(6)(c)(ii), MCA, applies to vacatur. *Water for Flathead's Future*, ¶¶ 35-36; *Protect the Clearwater v. Mont. Dep't of Env't Quality*, 2024 MT 181, ¶ 19, 417 Mont. 527, 554 P.3d 197. Although *Protect the Clearwater* dealt with injunctive relief, it reaffirmed this Court's holding in *Water for Flathead's Future* that § 75-1-201(6)(c), MCA, applies to all equitable remedies sought for MEPA violations, including vacatur. *Protect the Clearwater*, ¶ 19.

¶75    MEIC also argues that policy and constitutional considerations should shape our reasoning on the remedy issue. MEIC does not, however, directly challenge the remedy provisions as unconstitutional. Like in *Water for Flathead's Future*, we decline to address this question. *Water for Flathead's Future*, ¶ 36.

¶76    MEPA provides the procedure for consideration of a project's impacts on the environment, and under *Park County Environmental Council* and § 75-1-201(6)(c), MCA, alleged non-compliance with that procedure means a plaintiff may seek to stop the project until the procedural MEPA violation has been addressed. Section 75-1-201(6)(c)(ii),

---

[7] MEIC further raises an argument about the potential harms of requiring a plaintiff to "provide[] a written undertaking to the court" under § 75-1-201(6)(d), MCA. Neither NorthWestern nor DEQ requested a bond in this case, and that issue is not properly before the Court.

MCA, provides the specific findings a district court must make to grant such equitable relief. Vacatur is one of the equitable remedies permitted under § 75-1-201(6)(c)(ii), MCA, but the clear statutory language of § 75-1-201(6)(c), MCA, requires that a court analyze the considerations under subsection (6)(c)(ii) before granting vacatur. The District Court was in error when it vacated the permit without analyzing the factors and applying the framework of the statute. The court recognized the statutory compliance problem when it referenced *Water for Flathead's Future* in granting the stay on June 8, 2023. As noted, MEIC did not seek relief from that order. On appeal, MEIC does not argue that the statutory factors were met or that they could now be satisfied were the case returned to the District Court for further consideration. We reverse the District Court's order granting vacatur. *Accord Water for Flathead's Future*, ¶¶ 36-37.

¶77 Finally, NorthWestern argues that if this case is remanded for further MEPA analysis, the 2021 version of the statute would not be reinstated even if *Held* declares the 2023 MEPA amendment unconstitutional. In support of its argument, NorthWestern cites Texas and Tenth Circuit authority, which is not precedential or binding on this Court, and ignores clear Montana precedent to the contrary:

> We have explained that an invalidated statute "is in reality no law, but is wholly void, and in legal contemplation is as inoperative as if it has never been passed." *State ex rel. Woodahl v. District Court*, 162 Mont. 283, 290, 511 P.2d 318, 322 (1973). The "natural effect of this rule is that the invalidity of a statute leaves the law as it stood prior to the enactment of the invalid statute." *Woodahl*, 162 Mont. at 291, 511 P.2d at 322. Thus, under Montana law, when an amended statute is invalidated the statute is left in the same position that it was in before the amendment was introduced. *In re O'Sullivan*, 117 Mont. 295, 304, 158 P.2d 306, 310 (1945).

40

*Clark Fork Coal. v. Tubbs*, 2016 MT 229, ¶ 40, 384 Mont. 503, 380 P.3d 771; *see also*

*Mont. Democratic Party v. Jacobsen*, 2024 MT 66, ¶ 111 n.30, 416 Mont. 44, 545 P.3d

1074. Thus, on remand, DEQ should be guided by the law as it existed prior to the 2023

MEPA amendment to § 75-1-201(2)(a), MCA, that was declared unconstitutional in *Held*.

*Held*, ¶ 68

## CONCLUSION

¶78   We affirm the District Court's ruling that DEQ adequately analyzed noise impacts

in its EA. We also affirm the court's ruling that the 2021 MEPA statutory scheme applies

and required DEQ to analyze GHG emissions as part of the air quality permitting process

in this case. We affirm the District Court's ruling requiring DEQ to conduct additional

review on lighting impacts. We reverse the District Court's April 6, 2023 order vacating

the permit. The permit is reinstated, and the case is remanded to the DEQ for further MEPA

analysis in accordance with this Opinion.


                                          /S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA


Justice Jim Rice, specially concurring.

¶79   I concur with the Court's determination to reverse the vacatur of the permit, but for

different reasons. While a MEPA review would not usually be mooted in an appeal of a

permit, I believe this case is mooted under the particular circumstances here.

41

¶80 First, the Court correctly recognizes that this case involves a "triggering state action," that being "the air quality permit for the LGS facility." Opinion, ¶ 51. Thus, in contrast to the recent *Held* case, where there was no such permit or other triggering state action, one is present here, satisfying the Constitution's requirement that a case-or-controversy exists.

¶81 The LGS facility has now been long operational pursuant to the permit it properly obtained under the law as it existed at the time of the application process, and no challenge is made to that determination on the substance of the permit. Two weeks ago, MEPA was changed by a ruling of this Court, but in the meantime, the facility became operational, is connected to the power grid, and is providing critical power resources. While future permitting applications for the facility will be subject to new requirements, I do not believe the facility's current permit should be subject to disapproval over the MEPA review issues that the Court has now identified.

¶82 DEQ did not make its decision to not conduct GHG analysis for this permit merely because of the MEPA limitation, § 75-1-201(2)(a), MCA, then in effect. Rather, it also made an informed discretionary determination that, even though the agency was complying with federal reporting requirements, GHGs were not currently subject to a regulatory structure to be administered by the Air Quality Bureau, which works in tandem and is reliant upon its counterpart federal agency and the federal standards. Thus, there was not in existence, at the time the permit was processed, a separate state system of standards and regulations necessary for such review. DEQ does participate in the Greenhouse Gas Reporting Program (GHGRP), which requires approximately 8,000 facilities, based on

their amount of GHG emissions, to report annually, from which the EPA provides demographic data of populations living within three miles of GHGRP facilities, visualizations of national emission trends, and a search base to search by state and by any individual GHGRP facility. Available is the total facility emissions in metric tons of CO2 equivalents, emissions by gas, emissions by source and process, information on stationary combustion including types of fuel used, measurement methods, equipment groupings, and data of a facility's total emissions over all active years, showing trends in specific GHG emissions. EPA, https://www.epa.gov/ghgreporting [https://perma.cc/Q46G-2SQ8] (last updated Oct. 23, 2024). This system provides information to the Legislature and the public, and will remain applicable to the LGS facility. "[A]n agency decision is not arbitrary and capricious when it has considered relevant data, articulated a reasoned explanation for its rationale, and supported its determination with substantial evidence." Opinion, ¶ 19. "The relevance or property of a particular criterion . . . depends on the nature of the proposed state action in each particular case." *Bitterrooters*, ¶ 22.

¶83 Questions remain regarding proper consideration of GHG emissions and the creation of a necessary regulatory structure to be applied to permit requests, which will not be resolved by a remand for further review in this case. Therefore, I would reverse the vacatur of the permit and bring this particular permit matter to a close.

/S/ JIM RICE

Justice Dirk Sandefur joins in the special concurring Opinion of Justice Rice.

/S/ DIRK M. SANDEFUR

43

Justice Laurie McKinnon, specially concurring and dissenting.

¶84 In my opinion, the Court undermines the significance of MEPA's role in our legislative and constitutional scheme which ensures environmental harms infringing on Montanans' right to a clean and healthful environment are prevented. Repeatedly, the Court emphasizes that MEPA imposes only "procedural" requirements, Opinion, ¶¶ 14, 52; that this Court's standard of review is "narrow," Opinion, ¶¶ 12, 31, 41; and that the agency's decision is entitled to "great deference," Opinion, ¶¶ 12, 21, 31, 35. Although true, and support can be found in our precedent for each of these propositions, the Court conveniently ignores MEPA's significant role in meeting the State's anticipatory and preventative constitutional obligations to protect a clean and healthful environment. Here, DEQ, in contravention of clear statutory mandate, failed to conduct any review under MEPA of the significant amount of GHG the LGS would produce. DEQ chose this path despite the nearly 700 public comments overwhelmingly expressing concerns during the MEPA process about the environmental impacts of the LGS's GHG emissions. Although arriving ultimately at the correct conclusion that DEQ's MEPA review was deficient, the Court "cherry-picks" precedent—presumably to demonstrate we have acted within our scope of "narrow review" and provided "great deference to the agency"—in order to soften its ultimate blow and conclusion that the permit was issued without adequate MEPA review.

¶85 During the appeal of these proceedings, the LGS has become operational because of a combined multitude of circumstances emanating from the Legislature, the executive branch (the Governor and DEQ), and the courts. However, each official has a

constitutional obligation to ensure the prevention of environmental harm infringing on Montanans' right to a clean and healthful environment. The Court ignores precedent that establishes the significance of adequate MEPA review in protecting this constitutional right. It myopically focuses on the failure of MEIC to appeal the stay of the vacatur (without stating the significance of the stay when the merits have been decided here); the failure of the District Court to make adequate findings prior to vacating the permit (DEQ conceded a remand for findings to be made would be adequate); and MEIC's failure to argue on appeal that the requisite statutory findings were nonetheless present (although we conclude here MEIC did succeed on the merits and an adequate MEPA review is clearly in the public interest). Alarmingly, and in contravention of clear precedent, the remedy the Court chooses to do is nothing. The Court allows the LGS to continue with its environmental harm and remands so that the public may be informed of what it already knew—the consequential impact on its community from LGS's emissions of GHG.

¶86 MEPA requires environmental review prior to government actions that may significantly affect the human environment. MEPA was enacted in 1971, prior to the 1972 Constitutional Convention. MEPA's policy declaration provided that "[t]he legislature recognizes that each person shall be entitled to a healthful environment and that each person has the responsibility to contribute to the preservation and enhancement of the environments." Section 75-1-103(3), MCA (1971). MEPA's statement of purpose is to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man, to enrich the understanding of the ecological systems and natural resources important to the state." Section 75-1-102, MCA (1971).

*See also Park Cnty. Envt'l Council*, ¶ 65 (discussing MEPA's enactment and original language). As noted in *Park County. Environmental Council*, the Montana Constitution's framers "likely saw MEPA as an essential element of Legislative efforts to meet the government's newly-enshrined constitutional obligations." *Park Cnty. Envt'l Council*, ¶ 69. "MEPA's freshly enacted references to an individual right to a healthful environment—vested in present and future generations—and the State's role in preventing degradation and 'unintended consequences' to that environment could not have been far from the minds of the delegates who convened in January of the following year to constitutionalize" these environmental principles. *Park Cnty. Envt'l Council*, ¶ 69.

¶87    In *MEIC 1999*, we determined that the framers of the Montana Constitution intended it to contain "the strongest environmental protection provision found in any state constitution." *Mont. Envt'l Info. Ctr. v. Mont. Dep't of Envt'l Quality*, 1999 MT 248, ¶ 66, 296 Mont. 207, 988 P.2d 1236 [*MEIC 1999*]. Article II, Section 3, of the Montana Constitution guarantees Montanans the inalienable right to a clean and healthful environment; and Article IX, Section 1, provides that the legislature is to administer and enforce the obligations of the state and each person to maintain a clean and healthful environment. These constitutional provisions were meant to be "both anticipatory and preventative" and "do not require that dead fish float on the surface of our state's rivers and streams before [the Montana Constitution's] farsighted environmental protections can be invoked." *MEIC 1999*, ¶ 77. As Delegate Mae Nan Robinson said during the 1972 Constitutional Convention:

[I]f you're really trying to protect the environment, you'd better have something whereby you can sue or seek injunctive relief before the environmental damage has been done; it does very little good to pay someone monetary damages because the air has been polluted or because the stream has been polluted if you can't change the condition of the environment once it has been destroyed.

Montana Constitutional Convention, Verbatim Transcript, March 1, 1972, Vol. V, p. 1230. We explained in *Park County Environmental Council* that this "forward-looking and preventative language clearly indicates that Montanans have a right not only to reactive measures after a constitutionally-proscribed environmental harm has occurred, but to be free of its occurrence in the first place." *Park Cnty. Envt'l Council*, ¶ 62.

¶88     In 2003, MEPA was amended to state it was "procedural," and that each person has a right to "pursue life's basic necessities" which "requires the balancing of competing interests." Sections 75-1-102(1) and -103(3), MCA. Despite these amendments, MEPA remained the essential tool in ensuring the Legislature fulfilled its constitutional obligations to prevent environmental harms infringing on Montanans' right to a clean and healthful environment. And despite the Court's reference that MEPA governs "procedure only" and "does not provide 'for regulatory authority, beyond authority explicitly provided for in an existing statute, to a state agency[]'," Opinion, ¶ 52, MEPA specifically provides that "[t]he policies and goals [of MEPA] are *supplementary* to those set forth in existing authorizations of all boards, commissions, and agencies of the state." Section 75-1-105, MCA (emphasis added). Thus, while MEPA is procedural, this does not mean it is "unimportant." *Park Cnty. Envt'l Council*, ¶ 70.

¶89 We have explained the significance of MEPA in protecting Montanans from environmental harm previously:

> The Montana Constitution guarantees that certain environmental harms shall be prevented, and prevention depends on forethought. MEPA's procedural mechanisms help bring the Montana Constitution's lofty goals into reality by enabling fully informed and considered decision making, thereby minimizing the risk of irreversible mistakes depriving Montanans of a clean and healthful environment. Therefore, the Legislature cannot fulfill its constitutional obligation to prevent proscribed environmental harms without some legal framework in place that mirrors the uniquely 'anticipatory and preventative' mechanisms found in the original MEPA.
>
> .   .   .
>
> [M]EPA performed an essential part of the Legislature's efforts to meet its constitutional obligations by ensuring that information was gathered and carefully considered *before* committing to an action with potential to cause environmental harm forbidden by the Constitution.
>
> .   .   .
>
> Without a mechanism to prevent a project from going forward until a MEPA violation has been addressed, MEPA's role in meeting the State's 'anticipatory and preventative' constitutional obligations is negated. Whatever interest might be served by a statute that instructs an agency to forecast and consider the environmental implications of a project that is already underway—perhaps analogous to a mandatory aircraft inspection after takeoff—the constitutional obligation to prevent certain environmental harms from arising is certainly not one of them.

*Park Cnty. Envt'l Council*, ¶¶ 70-73 (emphasis in original). Thus, in my opinion, the Court does an injustice to our precedent which has described MEPA as serving an essential role in enabling the Legislature to fulfill its constitutional mandate of preventing constitutional harms. While I agree with the Court's conclusion on the first three issues, I cannot endorse the Court's effort to minimize the role MEPA plays in protecting our substantive rights to a clean and healthful environment.

48

¶90 Nor can I accept the Court's reasoning regarding the ultimate remedy. Here, the Court reverses the District Court's vacatur of the permit despite concluding the District Court was correct. The Court concludes the District Court's failure to make findings under 75-1-201(6)(c)(ii), MCA, is dispositive of the remedy. Opinion, ¶ 76. The Court's reasoning is short-sighted and contrived. Section 75-1-201(6)(c)(ii), MCA, sets forth the standard for granting a preliminary injunction, "or other equitable relief," and requires the District Court to find the challenging party is likely to prevail on the merits of its claim, will suffer irreparable harm in the absence of the relief, that relief is in the public interest, and that relief is narrowly tailored. MEIC has prevailed here on the merits of its claim and has demonstrated irreparable harm because LGS has become fully operational without adequate MEPA review. The requirement for adequate MEPA review in the context of such a large-scale plant emitting GHG is clearly consistent with the statement and purpose of MEPA and in the public interest. Finally, the only relief that can ensure the public is not irreparably harmed is to prevent the LGS from becoming operational until adequate MEPA review is completed. Thus, the Court's decision itself establishes that vacatur of the permit was appropriate and correct under § 75-1-201(6)(c)(ii), MCA. The Court avoids such an inquiry by claiming that MEIC did not raise the argument on appeal that the requirements for vacatur had been met. In my opinion, it is our job to examine the entire record and to ensure that the legislative purpose and intent underlying the statute is realized. The Court concludes that the MEPA review was inadequate, that MEIC prevails on the merits, and that the public has a right to participate in the MEPA process. In doing so, we have ensured that the legislative purpose and intent underlying MEPA is satisfied.

49

However, when we fail to provide relief for the constitutional harm we have found to exist, we fundamentally subvert the purpose of the statute. Our decision is empty and will be meaningless to the Montanans who want and believe the plant should be evaluated for its GHG emissions *before* it becomes operational. Here, it is particularly disturbing that the Court reverses the vacatur because, to the extent the District Court was required to make specific findings, the DEQ has conceded that the matter can be remanded for the District Court to consider and make those findings.

¶91 During oral argument, counsel for DEQ addressed the potential remedy should this Court conclude there was a MEPA violation. We have concluded that, in fact, there was a clear MEPA violation. The DEQ requested that, in such event, the Court should remand these proceedings to the District Court, with concurrent jurisdiction to both DEQ and the District Court to allow DEQ to conduct additional MEPA analysis and the District Court to make the requisite findings under § 75-1-201(6)(c)(ii), MCA. Such a concession makes sense and achieves the constitutional aspirations and purpose underlying MEPA and MEPA's clear statutory dictate, in contrast to the Court's poorly reasoned and labored decision here.[1] We routinely remand matters to the trial court to make findings and conclusions in support of the court's decision. The parties do not dispute that this is the appropriate remedy to resolve the dispute should we determine a MEPA violation occurred

---

[1] It is clear DEQ understood MEIC continued on appeal to seek vacatur of the permit by seeking success on the merits. As the DEQ's request is appropriate and consistent with our precedent, I do not address the arguments of MEIC that vacatur is a less severe remedy than a preliminary injunction and therefore the requirement to make specific findings does not apply. The solution here has been provided by DEQ's counsel and is dispositive.

and, further, that such a remedy is consistent with the manner in which a MEPA violation may be handled.

¶92 The Court relies on *Water for Flathead's Future, Inc.*, to support its conclusion that the vacatur should be reversed. However, again, the Court "cherry-picks" from precedent and fails to grasp the distinctions and factual nuances in *Water for Flathead's Future, Inc.* and here. In *Water for Flathead's Future, Inc.*, the trial court acknowledged that vacatur was improper and that the challengers could not meet the requirements of § 75-1-201(6)(c)(ii), MCA, but nonetheless vacated the permit under its "inherent authority," citing as support *Park County Environmental Council*. *Water for Flathead's Future, Inc.*, ¶ 35. Although we concluded there was no MEPA violation in the first instance, we went on to explain—in order to correct the trial court's misconception of its authority—that vacatur was only permissible if certain findings and conclusions were made consistent with § 75-1-201(6)(c)(ii), MCA. *Water for Flathead's Future, Inc.*, ¶ 36. As the trial court acknowledged those circumstances were *not* met but nonetheless decided it had the "inherent authority" to vacate the permit, we concluded vacatur was inappropriate and that the "exclusive remedies" provided in the statute did not include the ability to vacate a permit pursuant to a court's inherent authority. Importantly, in *Water for Flathead's Future, Inc.*, we held that there was no MEPA violation, thus rendering the challengers' request for equitable relief moot. Our discussion of the "exclusive remedy" provisions of § 75-1-201(6)(c)(ii), MCA, was therefore unnecessary to our decision and apparently only made to dispel the notion that there was any "inherent authority" of a trial court to vacate a permit apart from the provisions of § 75-1-201(6)(c)(ii), MCA. We do

51

not have the same circumstances present here. Indeed, the decision of the Court in this appeal demonstrates many, if not all, of the requirements of § 75-1-201(6)(c)(ii), MCA, have been met and support the trial court's reasoning and conclusion that vacatur is the appropriate remedy. And, again, DEQ has conceded that these proceedings can be remanded for the trial court to enter its findings and conclusions.

¶93 The Court's decision throws out the baby with the bathwater by declaring that an adequate MEPA evaluation is not moot because the "public may still participate in the process of a project that impacts their communities." Opinion, ¶ 62. The Court's decision is hollow justice and skirts the hard issue at stake—vacating the permit of an operational power plant. The question here is whether an adequate environmental review must occur *before* decisions are made which have the potential of causing environmental harm, not whether the constitutionally required review may occur *after* the project has become fully operational. The Court's decision to reverse the District Court's vacatur order, when the MEPA review was clearly inadequate, is "analogous to requiring a mandatory aircraft inspection after its takeoff." *Park Cnty. Envt'l Council*, ¶ 72. The Court has undermined the importance of MEPA review and negated the State's obligation to provide for "anticipatory and preventative" review before the environmental harm occurs. We have no precedent, particularly *Water for Flathead's Future, Inc.*, which supports the Court's reasoning and holding where there has been an inadequate MEPA review.

¶94 While I agree the Court has reached the correct result on Issues 1-3, I cannot endorse the Court's minimization of MEPA's significance, nor its decision to reverse the District Court's vacatur of DEQ's permit. The Court finds a constitutional harm but provides no

remedy when the remedy is simple and clear. DEQ has conceded to a remand for the District Court to comply with § 75-1-201(6)(c)(ii), MCA. I agree that this is the appropriate relief that should be ordered. I can only imagine what Montanans will think when they learn this Court has allowed 769,702 tons of carbon dioxide equivalent ($CO_2e$)—a little over 750 thousand tons of greenhouse gases—to be emitted annually into the atmosphere before an adequate MEPA analysis is conducted to consider the constitutional and environmental harm.

/S/ LAURIE McKINNON

Justice Ingrid Gustafson joins in the Specially Concurring Opinion and Dissent of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON